FILED

CLERK, U.S. DISTRICT COURT

6/30/25

CENTRAL DISTRICT OF CALIFORNIA

BY_____ CS _____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

-----------------------------------------------------X

CLAYTON HOWARD                                  :
                                                :     Civil Case No:   CV25-6031-UA
            Plaintiff,                           :
                                                :
                                                :
        v.                                      :     **COMPLAINT**
                                                :
SEAN COMBS, CASSANDRA VENTURA ,:     **JURY TRIAL DEMAND**
BAD BOY RECORDS, EPIC RECORDS,   :
EPIC RECORDS, COMBS ENTERPRISES, :
LLC, BEVERLY HILLS HOTEL Corp     :
and DOE CORPORATIONS 1-10         :
                                                :
            Defendants,                          :
-----------------------------------------------------X

| TRIGGER WARNING: |
| --- |
| THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A SEXUAL NATURE, INCLUDING SEXUAL ASSAULT |

Plaintiff Clayton Howard (a.k.a "Dave" and "Mr. Howard") hereby alleges, as and for his Complaint against Defendant Sean Combs ("Mr. Combs"), Cassandra Ventura ("Ms. Ventura"), Bad Boy Entertainment, Bad Boy Records, Epic Records, Combs Enterprises, LLC, and Doe Corporations 1-10 (together, "Defendant Corporations," and together with Mr. Combs, "Defendants") as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff Clayton Howard brings this civil action against Defendants Sean Combs and Cassandra Ventura arising from an eight-year period of systematic sexual exploitation, trafficking, and abuse that occurred between approximately 2009 and

2019. This case exposes the darker truth behind the widely publicized narrative surrounding Defendant Ventura's recent civil settlement and the ongoing criminal prosecution of Defendant Combs.

2. Defendant Sean Combs is a prominent rapper and record executive known by his stage names "Puff Daddy," "P. Diddy," or "Diddy," who rose to fame in the early 1990s with his record label Bad Boy Records and is regularly referred to as a hip-hop mogul.

3. Defendant Cassandra Ventura, known professionally as "Cassie," is a singer, actress, and model who gained prominence in the early 2000s with her single "Me and You" and appeared in films including "The Perfect Match" and "Step It Up 2 – The Streets."

4. Defendants maintained a highly publicized romantic relationship from 2007 to 2018, during which both were toxic individuals addicted to opiates and methamphetamines who had no regard for others or the law. Their relationship was characterized by sexually explicit, depraved activity categorized as "swinging," with Defendant Combs harboring a specific fetish for voyeurism. The relationship was abusive, with Defendant Combs frequently physically assaulting Defendant Ventura in response to domestic incidents neither could emotionally control.

The Misleading Public Narrative

5. In late 2023, Defendant Ventura filed a civil action against Defendant Combs pursuant to the Gender Motivated Violence Act, alleging that Combs manipulated, abused, and controlled her for over a decade through violent behavior and disturbing demands. She claimed to have spent over a decade trapped in a cycle of abuse,

2

violence, and sex trafficking, including allegations that Combs forced her to engage in sex acts with male sex workers while he masturbated and filmed the encounters. The parties settled this action within 24 hours for twenty million dollars.

6. Subsequently, the Office of the U.S. Attorney for the Southern District of New York arrested and indicted Defendant Combs for sex trafficking and violations of the Mann Act, with the prosecution's foundation based largely on Defendant Ventura's allegations. Defendant Combs currently faces trial on RICO charges.

7. Contrary to the narrative presented in Defendant Ventura's civil complaint and the subsequent criminal prosecution, the truth reveals a far more complex and disturbing reality. Defendant Ventura was not merely a victim forced into sexual encounters with male escorts, but rather an active and engaged participant who willingly manipulated and exploited others, including Plaintiff, to satisfy the sexually depraved desires of Defendant Combs and herself.

8. For more than eight years, Defendants operated a scheme whereby they systematically exploited Plaintiff through manipulation, coercion, controlled substances, and threats of violence to engage in non-consensual sexual activities for their gratification and commercial purposes. Defendant Ventura accomplished this exploitation by concealing her identity and fabricating the narrative that she and Defendant Combs were "married," using this deception to entice men into drug use and sexual encounters.

9. Defendants drugged Plaintiff with controlled substances, including MDMA in doses three times stronger than what Defendant Ventura herself consumed, to lower his inhibitions and facilitate sexual exploitation. Defendant Ventura used these substances

3

strategically, "like a spider catching its prey in its web," to manipulate Plaintiff into unprotected sexual contact designed to please Defendant Combs and prove her devotion to his appetites.

10. Defendant Ventura would command Plaintiff to masturbate for hours while she pleasured herself to climax, visibly satisfying herself at the sight of Plaintiff's anatomy. These extended masturbation sessions often left Plaintiff's penis bruised and swollen, injuries about which he would complain to Defendant Ventura seeking consideration. However, Defendant Ventura showed no mercy, simply demanding compliance while pleasuring herself in a manner she hoped would satisfy Defendant Combs, who derived satisfaction from watching her gratification through his voyeuristic desires.

11. During these encounters, Defendant Combs watched silently in the shadows, directing the activities as if he were a film director orchestrating his vision. Once Defendant Ventura was ready to begin, Defendant Combs regulated her responses and controlled the rate of sexual activity, exercising complete dominance over both Plaintiff and Defendant Ventura in what the couple considered a special shared experience.

12. While Defendant Combs appeared to serve as a "protector" rather than an "oppressor," supporting Defendant Ventura's desires and catering to her with wine and fruit during encounters, his presence was deliberately intimidating as part of his role in protecting his partner from the men they exploited. Threats of violence were implied when Defendant Combs wished to assert control, and during at least one encounter, he threatened to "pistol whip" Plaintiff, directing Defendant Ventura to the master suite to retrieve his firearm.

13. At no time did Defendant Ventura display fear when engaged in or about to engage in sexual encounters. All abuse witnessed by Plaintiff occurred due to domestic complications between the Defendants, including jealousy, ego, and arrogance, aided by extensive drug use and sleep deprivation, which contributed to violent outbursts from Defendant Combs, who consumed far more drugs than Defendant Ventura.

Sexual Assault and Non-Consensual Recording

14. Over the years, Plaintiff was sexually assaulted by Defendant Ventura, who would manipulate and force herself upon Plaintiff during her menstrual cycle against his will. Defendants filmed Plaintiff in compromising encounters without his consent for years, creating recordings that the couple would watch together after the encounters ended and use for mutual masturbation.

15. When Plaintiff confronted Defendant Ventura about the recording and vocalized his desire not to be recorded, she explained that she enjoyed their sexual relationship and provided her reasons for the recordings. Defendant Ventura then opened her MacBook to a previous recording and masturbated to climax in front of Plaintiff while watching an encounter involving the two of them, demonstrating the extent of her manipulation and control.

Commercial Sex Trafficking

16. For more than five years, Defendants trafficked Plaintiff for purposes of commercial sex, using him as entertainment to satisfy their sexual fetishes and personal ambitions. The couple drugged, manipulated, and traumatized Plaintiff while themselves engaging in a toxic, domestically abusive relationship that often became violent.

17. Defendant Ventura had a specific preference in selecting her companions and chose Plaintiff for eight years over many other available options, as subsequent criminal trial proceedings have revealed. The allegations demonstrate that Defendant Ventura deceived, manipulated, and injured Plaintiff and therefore, should be held accountable alongside Defendant Combs, as the two were partners in these criminal enterprises.

Obstruction of Justice and Witness Manipulation

18. Plaintiff's ability to seek timely legal recourse was deliberately frustrated through a coordinated effort involving his former counsel, who communicated with federal prosecutors without Plaintiff's presence. The Plaintiff was advised to remain silent and was manipulated into inaction, with his attorney intentionally delaying action to protect Defendant Ventura's credibility.

19. The Plaintiff was specifically advised that should he file a complaint, he would lose credibility before the court and therefore should refrain from doing so if he wished to do what was right and tell the truth. His counsel deceived, ignored, and misled him regarding the creation of the initial complaint against Defendants and when it would be filed.

20. Despite serving as a compliant witness for the government and providing information that was later corroborated by investigators, thereby validating his credibility and the truthfulness of his statements, federal prosecutors ultimately withheld Plaintiff's testimony despite its corroborative value and his valid allegations against both Defendants.

Denial of Justice and Present Claims

21. For many years, Plaintiff has lived with this trauma in silence, forced to endure the psychological and physical consequences with no visible avenue for justice. While Defendant Ventura's allegations have destroyed Defendant Combs's career, she has escaped liability by using allegations of abuse to avoid criminal responsibility for her own actions, thereby denying victims like Plaintiff the justice to which they are entitled.

22. With the opening of legislation that granted survivors a look-back window to seek justice against offenders, Plaintiff learned he had been given a second chance to obtain the justice he deserved. The Plaintiff has sought justice for over a year only to be denied through the manipulation of legal professionals who wished to effect the criminal trial of Sean Combs.

23. Mr. Howard was used and manipulated. Now, tired of the misconduct and incompetence, he has sought action himself and refuses to remain silent any longer in the face of this systematic exploitation, abuse, and attorney misconduct.

**24.** This action seeks declaratory, injunctive, and monetary relief under federal sex trafficking statutes (18 U.S.C. § 1591 et seq.), the New York State Human Rights Law (Exec. Law §§ 290 et seq.), the New York Services for Victims of Human Trafficking (N.Y. Servs. Law § 483-BB), the California Trafficking Victims Protection Act (Cal. Civ. Code § 52.5), Civil Cause of Action for Human Trafficking (Fla. Stat. § 787.061), Civil Remedy for Human Trafficking (18 U.S.C. § 1595), Sexual Assault pursuant to The California Sexual Abuse and Cover Up Accountability Act (Cal. Civ. Proc. § 340.16), and Civil Liability for Violations of New York Penal Law § 230.34 -

Sex Trafficking, for the severe psychological, physical, and dignitary harms Plaintiff suffered during this prolonged period of exploitation and abuse.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this action asserts violations of 18 U.S.C. §1591, et seq., and therefore raises federal questions regarding the deprivation of Plaintiff's rights. The Court has supplemental jurisdiction over the Plaintiff's related claims arising under state and city law pursuant to 28 U.S.C. § 1367(a).

26.    Under 28 U.S.C. § 1391(a)(2) and (b), venue is proper in this Court because the proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature. Additionally, all Defendants are residents of the State in which the district is located.

## PARTIES

27.    Plaintiff Clayton Howard is a resident of New York and New Jersey. Beginning in fall 2009, he accepted work as an independent male companion in New York. Under the alias "Dave," he saw clients for almost sixty (60) days before he met the Defendants.

28.    Mr. Howard was recruited and manipulated by the defendants Sean Combs, Cassandra Ventura, Bad Boy Records LLC, and Bad Boy Entertainment and its related entities (among them, Doe Corporations 1-10) beginning in 2009, and concluding 2019. At all relevant times herein, Mr. Howard met the definition of an "employee" while under the control of the Defendants under relevant statutes.

29.     Defendant Sean Combs, upon information and belief, resides within the state of California. At all relevant times herein, Mr. Combs met the definition of an "employer" of the Plaintiff under relevant statutes.

30.  Defendant Cassandra Ventura, upon information and belief, resides within the State of California. At all relevant times herein, Ms. Ventura met the definition of an "employer" of the Plaintiff under relevant statutes.

31.  Defendant Bad Boy Entertainment is a music, media, and entertainment company founded by Defendant Sean Combs, which includes the record label Defendant Bad Boy Records LLC. At all relevant times, Defendant was an "employer" of the Plaintiff within the meaning of all applicable statutes.

32.  Defendant Bad Boy Records LLC is a Delaware limited liability company with its principal place of business located in New York. At all relevant times, Defendant was an "employer" of the Plaintiff within the meaning of all applicable statutes.

33.  Defendant Epic Records is a New York-based record label owned by Sony Music Entertainment, a subsidiary of Sony Corporation of America. At all relevant times, Defendant was an "employer" of Plaintiff within the meaning of all applicable statutes.

34.  Defendant Combs Enterprises, LLC is a New York limited liability company. At all relevant times, Defendant was an "employer" of the Plaintiff within the meaning of all applicable statutes.

35.  Defendant Beverly Hills Hotel is owned by the Dorchester Collection since 1996. At all relevant times, Defendant facilitated sex trafficking when any "employee" aided other Defendants in the commission of illegal activity.

36. Defendant Doe Corporations 1-10 are corporations and entities affiliated and associated with the Defendant Corporations. At all relevant times, Defendant Doe Corporations were "employers" of Plaintiff within the meaning of all applicable statutes.

## **FACTUAL ALLEGATIONS**

### I.    **Mr. Howard meets Combs and Ventura under Fraudulent circumstances.**

37. Mr. Howard ("Dave") met Ms. Ventura ("Jackie Star") in late 2009.

38. Ms. Ventura, who identified herself as "Jackie Star," invited Mr. Howard ("Dave") to The London hotel located in New York City to serve as a male companion and provide her with time and company in the privacy of her hotel room for an agreed-upon hourly rate.

39. Ms. Ventura attempted to conceal her identity through the use of makeup, a large red wig, and dim lighting in the room, which created poor visual conditions.
Ms. Ventura failed to inform Mr. Howard prior to the meeting that another party would be present.

40. Immediately after greeting Mr. Howard, Ms. Ventura offered him alcohol and a marijuana cigarette, then instructed him to be seated in the living room.
The two parties spoke for approximately thirty minutes while becoming familiar and relaxed.

41. After approximately thirty minutes, Ms Ventura asked to see the personal identification of Mr. Howard for safety purposes so she would "Know who he really was".

10

42. Having nothing to hide, and wanting to make a woman he assumed alone comfortable he provided Ms. Ventura ("Jackie Star") with his N.Y.S. Drivers License revealing his true identity.

43. Ms. Ventura informed Mr. Howard of her intentions by standing and requesting that he expose his genitals.

44. Under the influence of the substances provided, Mr. Howard agreed to Ms. Ventura's request, and she claimed to be impressed.

45. Ms. Ventura then informed Mr. Howard that they were not alone and that her "husband" was upstairs, but assured him that the situation was acceptable because her "husband" had consented to her having a male companion visit to see where things might lead.

46. Ms. Ventura explained that she and her husband were participants in "the Lifestyle" and that her "husband" preferred to watch her be pleasured by men with larger male reproductive organs.

47. Ms. Ventura stated that she preferred men with darker complexions, complimenting Mr. Howard's complexion before excusing herself to retrieve her husband so that activities could begin.

48. Ms. Ventura retrieved Mr. Combs, whom she introduced as her "husband" and presented to Mr. Howard under the alias "Frank."

49. Mr. Combs greeted Mr. Howard with indifference, then retrieved baby oil and Astroglide lubricant, both of which had been positioned on a platter on the center table.

50. Mr. Combs then retreated to a darkened corner of the room where poor lighting made it difficult to observe his movements clearly.

51. Mr. Howard was instructed not to address Mr. Combs ("Frank") directly and to speak only to Ms. Ventura ("Jackie").

52. Mr. Combs concealed his identity by wearing a baseball cap pulled low over his eyebrows and a cloth tied around his nose and mouth, which obscured his facial features and made him unrecognizable.

53. When Mr. Combs did speak, it was to inquire whether Ms. Ventura was acceptable or if she needed anything.

54. Mr. Combs also provided "direction" to both Mr. Howard and Ms. Ventura, regulating the pace of their physical contact, as will be further explained in subsequent paragraphs.

## II.    <u>The First Encounter and the Structure of the Activities</u>

55. This first encounter served as Plaintiff's initial education into what would be required of him by the Defendants, with all subsequent encounters following an identical structure that forms the basis for the description of all encounters described hereafter within this complaint.

56. During each encounter, Mr. Howard had no autonomy; he was required to follow orders and was expected not to disobey.

57. Financial compensation was used as a form of dominance once Mr. Howard was committed to any activity within the encounter.

58. Mr. Howard was instructed by Ms. Ventura to remove all his clothing upon entry into the suite and to surrender his clothing and phones to Ms. Ventura.

59. Mr. Howard's cellphone was turned off and surrendered with his clothing to Ms. Ventura, which prevented him from leaving by choice without compromising his safety.

60. Some suites required keys to access the floors and had no access to stairwells without triggering alarms, making escape difficult.

61. Mr. Howard was instructed by Ms. Ventura to apply baby oil to his nude body.

62. When Mr. Howard applied the oil to his hand and began to distribute it evenly, Ms. Ventura would use her own bottle to saturate Mr. Howard's chest, abdomen, and arms with oil before stepping closer and attempting to apply it evenly herself.

63. Ms. Ventura often sprayed Mr. Howard with oil during application to make distribution over his skin easier.

64. The Defendants structured these encounters into four phases: (1) no touch, (2) soft foreplay, (3) fellatio, and (4) intercourse, which were directed by Mr. Combs for the purpose of controlling Ms. Ventura's arousal and timing of climax.

65. During these phases, Mr. Howard had no input or ability to offer suggestions and was simply expected to comply.

66. Through the use of manipulation and financial coercion, Mr. Howard would remain in these phases for hours, with each individual stage lasting for over an hour.

67. Ms. Ventura controlled the start of the activity and would seek Mr. Combs' permission regarding when she could progress to the next stage.

68. If Mr. Combs was not ready, he would refuse permission, but he often granted Ms. Ventura permission to masturbate if she requested.

69. Once the activity began, Mr. Combs controlled its progression and pace, seeking to control Ms. Ventura's desires while pleasuring himself rather than directly participating.

70. These prolonged masturbation sessions frequently caused skin tears and scabs on Mr. Howard's penis, causing him severe pain and scarring.

71. While Mr. Howard stood covered in baby oil, Ms. Ventura and Mr. Combs would masturbate while watching him, which gave him a constant feeling of uneasiness and uncertainty.

72. While Mr. Howard was ordered to stand nude, both Defendants would pleasure themselves to the point of climax.

73. Both Defendants would be intoxicated, using substances and alcohol to alter their moods and keep them awake.

74. Some of these substances were Schedule I narcotics, including amphetamines and opiates.

75. The specific drugs used included Ecstasy, GHB, Ketamine, Cocaine, MDMA (Molly), and Marijuana.

76. Ms. Ventura, in the earlier and middle years, was extremely physical with Mr. Howard and would orally pleasure him for periods exceeding one hour at times.

77. Dehydrated from drugs, lack of water, and constant engagement in oral sex, Ms. Ventura would often perform oral sex until she had to stop when her jaw became sore from the prolonged activity.

78. When intercourse was to occur, Ms. Ventura's arousal would be so heightened that she would often beg Mr. Combs to allow her to engage.

79. Mr. Howard was directed to engage in sexual contact with Ms. Ventura until she climaxed and was only allowed to stop once Ms. Ventura reached climax.

80. Once Mr. Combs consented to sexual contact, Ms. Ventura controlled the degree of intimacy, including kissing, the intensity of kissing, and whether she would engage in unprotected sex, as will be described in later paragraphs.

81. Once the climax of Ms. Ventura occurred, the cycle would be repeated.

82. One encounter with Ms. Ventura could consist of 15-30 individual sessions, each including all four stages.

83. The number of sessions also depended on the number of days Mr. Howard would be detained until the Defendants were ready to return his phone and clothing and release him.

84. If Mr. Howard attempted to leave, he would be coerced by Ms. Ventura into waiting or ignored if he knocked on the suite's master bedroom door seeking to retrieve his items to leave.

### III.    Ms. Ventura manipulates Mr. Howard into MDMA use and Unprotected Sex

85. During the trial testimony of Ms. Ventura, Mr. Howard heard her statements regarding Mr. Combs and how she allegedly had been forced to have unprotected sex with male entertainers.

86. Ms. Ventura claimed to have never wanted such activities and to have only engaged in them as a result of Mr. Combs' abuse and attempts to blackmail her.

87. Although this allegation was substantiated in one instance during the trial, it is not the same in all. It also does not completely substantiate all of Ms. Ventura's claims of force and coercion, as every instance is not the same.

15

88. Mr. Howard confidently asserts that Mr. Combs did not force Ms. Ventura to engage in a sexual encounter after the overdose she experienced while in his presence. It was Ms. Ventura who begged for the encounter despite Mr. Combs' repeated attempts to end the night due to the overdose.

89. Mr. Howard confidently asserts that it was Ms. Ventura who initiated unprotected sexual contact with him, and Mr. Combs had no knowledge of it occurring until it was underway.

90. Once Mr. Combs, who was observing the sexual activity, noticed there was no condom being used, he stopped the activity and confronted Ms. Ventura about her actions.

91. In response, Ms. Ventura lied to Mr. Combs, falsely informing him that she had reviewed Mr. Howard's STD test results and had confirmed he was completely clean.

92. Mr. Howard, immediately conscious of the lie, interrupted and told Mr. Combs the truth, which was that what Ms. Ventura had told him was false.

93. Mr. Howard then provided his actual STD test results to Mr. Combs directly from his email.

94. Once unprotected sex began, Mr. Howard would be pressured into continuing it by both parties.

95. Mr. Howard was told he would be the exclusive partner of Ms. Ventura, and it was agreed he would be compensated in exchange for clean test results and continued exceptional service.

96. The arrangement was agreed to after Mr. Howard was coerced into participating in an orgy with Ms. Ventura, Mr. Combs, and another male provider named Daniel Phillip.

97. The goal of the orgy was to determine who could please Ms. Ventura the longest without issue: Mr. Howard or Mr. Phillip.

98. The two men were offered substances and expected to perform continuously, taking turns with Ms. Ventura, who was an eager and willing participant.

99. This encounter lasted for nearly two (2) days before it ended.

100. When Mr. Howard outlasted Mr. Phillip, he was declared the winner, and the exclusive arrangement was proposed.

101. Drug use was a major component of the encounters during the majority of the meetings.

102. Mr. Howard did not engage in harder drugs for the first two years until they were offered to him by Ms. Ventura.

103. Mr. Howard, seeking to stay awake in response to repeated requests to satisfy Ms. Ventura, began to have difficulty staying awake as more was demanded of him.

104. Ms. Ventura offered Mr. Howard ecstasy, claiming it to be light and harmless in the dosage she would provide.

105. Mr. Howard would later learn from Ms. Ventura that she had tripled his dosage in order to get him "freaky," as he recalls, and increase the intensity of the encounter.

106. Believing the two were in a monogamous relationship since the exit of Mr. Phillip, always receiving clean results when taking STD tests, and through the inducement of drugs and alcohol, the unprotected sex continued.

107. Mr. Howard impregnated Ms. Ventura, who ultimately decided to abort the pregnancy when she was unable to locate Mr. Howard for a period of time.

108.    Even after aborting a pregnancy, Ms. Ventura sought to have unprotected sex during the encounters for years after.

109.    After reconnecting when separated for almost eight (8) months, Ms. Ventura confessed to Mr. Howard at New York City's Gramercy Park Hotel that she had aborted a pregnancy created by Mr. Howard.

110.    Despite this revelation, Ms. Ventura insisted on unprotected sex during that very encounter, which lasted several days as the two reconnected after the separation.

111.    It was after his victory in the encounter with Daniel Phillip that Ms. Ventura drugged Mr. Howard with a triple dosage of Ecstasy and manipulated him into engaging in unprotected sex.

**IV.    <u>Mr. Howard is drugged by Mr. Combs and Ms. Ventura</u>**

**Ms. Ventura Drugs Mr. Howard**

112.    Mr. Howard recalls being drugged by Ms. Ventura, who admitted to doing so when asked once Mr. Howard contacted her again after the initial incident.

113.    Specifically, Mr. Howard was given ecstasy by Ms. Ventura after he complained of exhaustion due to the demands placed upon him during the encounters.

114.    Instead of providing coffee or an energy drink, Ms. Ventura retreated to the bedroom and returned with an ecstacy pill.

115.    When Mr. Howard complained about his disdain for pills, Ms. Ventura crushed the pill and put it into a drink she prepared, informing Mr. Howard she had only included a small dosage.

116.    Having known Ms. Ventura for several years at this point, Mr. Howard trusted her and consumed the drink prepared by Ms. Ventura.

117.    Mr. Howard recalls feeling hot and beginning to sweat uncontrollably within several moments of consumption.

118.    When he complained of this to Ms. Ventura, her response was a passionate kiss, before she aggressively grabbed hold of his penis and placed it within her mouth.

119.    Mr. Howard recalls never feeling so intoxicated in his life, with the drug enhancing all his senses and sexual desires.

120.    He and Ms. Ventura began with condoms, but they were removed by Ms. Ventura, who quickly rolled off the protection and pressured unprotected contact while Mr. Howard's inhibitions had been lowered.

121.    Mr. Howard and Ms. Ventura would engage in the encounter for over two (2) days while Mr. Combs watched and, on occasion, engaged in contact with Ms. Ventura.

122.    When the parties were all exhausted, Mr. Howard was given back his belongings and allowed to leave; he was compensated with additional funds due to his condition, caused by dehydration and lack of sleep.

123.    Mr. Howard left confused, dehydrated, and disoriented, ultimately pulling his vehicle over and parking on the side of a grocery store.

124.    He woke up hours later, weak and sweating.

125.    He was able to get help by calling an Uber, which brought him home to his girlfriend.

126.    He spent three (3) days recovering from the encounter.

127.    After Mr. Howard confronted Ms. Ventura during the following encounter, she confessed to drugging him.

128.    Following this confession, he did not accept beverages from her, except three (3) times he accepted a drink over the next five (5) years.

129.    The final drink led to a physical assault on Ms. Ventura.

**Mr. Combs Drugs Mr. Howard**

130.    Mr. Howard was drugged by Mr. Combs in the Trump property at Columbus Circle in New York City.

131.    During the encounter, Mr. Combs offered Mr. Howard a pink substance in a small plastic bag he described as "Pink MDMA" or "Pink Molly."

132.    Mr. Howard, who only indulged in drugs with Ms. Ventura, was introduced to both "Molly" and "Ecstasy" by Ms. Ventura for purposes of enhancing their sexual encounters.

133.    Mr. Howard's knowledge of designer drugs was insufficient, and therefore, he did not trust the unknown substance at first when offered.

134.    Mr. Combs began to hint at Ms. Ventura's insistence on indulgence, explaining she may be angry if he did not partake.

135.    Mr. Combs had never offered Mr. Howard drugs before this point, and the two had developed a mutual respect during the years of contact connected by Ms. Ventura.

136.    Against his better judgment, Mr. Howard agreed to consume a small dosage, hoping it would satisfy the demand and end the matter for the night.

137.    Mr. Combs retreated to the master suite, and within minutes, Mr. Howard recalls becoming extremely warm before he began to sweat uncontrollably.

138.    He began to have violent spasms, which curled him over, forcing him to crawl into a nearby bathroom.

139.    At no time did either Ms. Ventura or Mr. Combs exit the master suite.

140.    Once in the bathroom, Mr. Howard began to vomit uncontrollably.

141.    The pain from his stomach was intense, and he could not stop the sweating no matter how much he wiped.

142.    The vomiting lasted several minutes until there was nothing left to regurgitate.

143.    Mr. Howard lay dizzy and weak on the bathroom floor for several minutes before he regained the strength to stand and approach the door.

144.    It was Mr. Combs who came upon the weakened and disoriented Mr. Howard first.

145.    Noticing the visible change, Mr. Combs inquired about Mr. Howard's condition.

146.    Mr. Howard recalls being afraid to confess his condition, but he began to feel so sick that he confessed his condition to Mr. Combs.

147.    Mr. Combs examined him briefly and agreed he did not look good.

148.    Mr. Combs turned to enter the master suite and asked Mr. Howard to wait.

149.    Mr. Combs and Ms. Ventura exited the suite together.

150.    When Ms. Ventura asked what was wrong, Mr. Howard informed her that what Mr. Combs had given him was responsible.

151.    Ms. Ventura asked Mr. Combs what he had given Mr. Howard, and Mr. Combs' response was "the pink shit."

152.    When Mr. Howard replied that Mr. Combs told him it was "Molly," it was Ms. Ventura who informed him that the substance he had been given was not "Molly."

153.    Mr. Howard was given around $1,500 and released.

154.    He managed to exit the hotel and walk over forty (40) city blocks in December conditions, sweating uncontrollably and afraid.

155.    Finally, around Union Square (located in lower Manhattan), he regained enough of himself to call a friend and ask for help.

156.    He was picked up on a side block and taken home to recover.

V.    **Mr. Combs and Ms. Venture coerce Mr. Howard into Sex Trafficking**

157.    Mr. Howard was flown by the special request of Ms. Ventura from New York City to Miami, Florida, and to Los Angeles, California, numerous times to entertain Ms. Ventura.

158.    Ms. Ventura would directly call Mr. Howard for encounters and, on occasion, threatened and/or pressured Mr. Howard to become available.

159.    The trafficking began shortly after Mr. Howard's "victory" over Daniel Phillip, the other male provider whom he was pitted against during a "sex-a-thon," as later described by Ms. Ventura.

160.    As part of his "reward," he began to receive perks like travel and small gifts given to him by Ms. Ventura.

161.    Mr. Howard would be contacted and asked if he was available to fly out to a location.

162.    In the beginning, it was exciting and flattering to experience such an attractive woman hungry for his attention.

163.    Over time, Mr. Howard became aware that this was much more than that.

164.    The first instance of trafficking occurred when Mr. Howard was flown to Miami from New York City after a call from Ms. Ventura.

165.    It was cold in New York City, and Ms. Ventura's call on a freezing winter day seemed like a gift for Mr. Howard.

166.    A flight was booked using JetBlue, which Ms. Ventura paid for, and Mr. Howard was off to Miami.

167.    Mr. Howard met the couple at the Mandarin, a hotel property located in the Miami area.

168.    Mr. Howard checked into a suite under the name "Frank Black," which was given to him by Ms. Ventura during the ride from the airport to the property.

169.    During all instances of sex trafficking, Mr. Howard would be presented to hotel staff as "Security" for Bad Boy Records, Ms. Ventura and Mr. Combs.

170.    Mr. Howard would spend days servicing Ms. Ventura, waiting to be released so he could return home to his normal life.

171.    He was asked to come for one (1) day, but he was not released until three (3) days later.

172.    Mr. Howard was inconvenienced but felt intimidated by the lifestyle of the couple, so he endured, hoping to be released sooner than he was.

173.    Mr. Howard would be flown to Miami many times, where he was induced into drug use, alcohol consumption, and prolonged unprotected sexual activity with Ms. Ventura.

174.    Ms. Ventura repeatedly stated to Mr. Howard how she "hated condoms and they irritated her."

175.    It was for this reason she was reluctant to use condoms, as she would state they irritated her and created a smell.

176.    It was during an encounter at the Beverly Hills Hotel in Los Angeles when Ms. Ventura forced herself on Mr. Howard during her menstrual cycle.

177.    As will be explained in a later paragraph, this was not an accident but a calculated disregard for the Plaintiff as punishment for refusing to comply with Ms. Ventura's command to fly into Los Angeles.

178.    Once Mr. Howard was under the control of the Defendants, he was given no means to return to his home state without satisfying Ms. Ventura.

179.    By use of coercion and fraud, Ms. Ventura would lure Mr. Howard to her with promises of gifts and favors to entice him.

180.    Defendants would use Mr. Howard for days as a sex slave, satisfying their own physical and psychological needs.

181.    Defendants lacked regard for the health or safety of Mr. Howard, as is now known by the dozens of men revealed to be part of this massive deception created by the Defendants.

**VI.    Ms. Ventura Sexual Assaults Mr Howard in Los Angeles Beverly Hills Hotel**

182.    The Defendants sex trafficked Mr. Howard to Los Angeles and arranged he be brought to them at the Beverly Hills Hotel.

183.    Upon arrival, the Plaintiff was instructed to wait, but feeling uncomfortable being in a new city in the middle of the night, the Plaintiff decided to go outside.

184.    Within minutes, he was contacted by Mr. Combs, who instructed him to reenter the hotel.

185.    He was told to inform the employee by the elevator that Mr. Howard worked for Mr. Combs and was expected.

186.    A Hotel Employee once told Mr. Howard was an "employee" of Mr. Combs, and ushered Mr. Howard to the penthouse suites of the Beverly Hills Hotel.

187.    Mr. Howard entered the suite to an environment strangely different from past encounters.

188.    No candles were lighting the rooms as had been custom during every encounter over the course of the years.

189.    Ms. Ventura was angry with Mr. Howard; this anger originated from his decision to spend his anniversary with his own partner and not fly to Los Angeles that day at the invitation of Ms. Ventura.

190.    Through the use of manipulation and physical positioning, coupled with the pressure of the presence of Mr. Combs, Ms. Ventura forced a sexual encounter upon Mr. Howard.

191.    She seduced him into complying with her, then removed his clothing.

192.    Once his clothing was removed, she manipulated him through foreplay into a compromised position on the sofa.

193.    Once on the sofa, she began kissing him, attempting to arouse him into participating in sexual activity.

194.    Mr. Howard remembers things felt strange, so he repeatedly asked her to wait. But Ms. Ventura ignored him, pinning him with her waist and hips to the couch.

195.    Ms. Ventura took hold of Mr. Howard's penis and quickly inserted it into herself.

196.    The sensation overwhelmed Mr. Howard, causing difficulties when he tried to use his motor functions.

197.    Ms. Ventura finished quickly, and it was then that Mr. Howard was able to remove

her and reach for a nearby light so that he could see what was going on.

198.    Mr. Howard discovered Ms. Ventura was menstruating, and it appeared heavy.

199.    Ms. Ventura pretended to be surprised but later revealed she was aware of her

menstruation but didn't think it would be "heavy."

200.    Mr. Howard remembers becoming angry and asking why she would have done

that to him.

201.    Mr. Ventura, drunk and visibly intoxicated, laughed and informed the Plaintiff it

wasn't a big deal.

202.    An argument ensued, which was cut short by Mr. Combs, who called Ms. Ventura

into the bedroom after apologizing to Mr. Howard, then asked that he remain calm.

203.    When the Defendant reentered the room, Mr. Combs admitted that Ms. Ventura

was aware but intoxicated and disregarded Mr. Howard's feelings. He provided him

with substantial bills and asked him to go to the suite that had been prepared for his

stay within the hotel until the next later in the day.

204.    Ms. Ventura later apologized for how she had treated Mr. Howard, blaming

intoxication and hormones due to her monthly cycle.

205.    Ms. Ventura would often order Mr. Howard to masturbate for her visual pleasure.

206.    Under the influence of substances, her requests would last hours without

consideration for the well-being of Mr. Howard.

207.    Mr. Howard suffered injuries such as tears to the shaft of his penis, which

eventually resulted in skin peeling and scabbing.

208.    These injuries were the result of prolonged periods of self-directed masturbation at the order of Ms. Ventura.

**VII.    Mr Howard Contracts STD from Ms. Ventura.**

209.        Ms. Ventura's disregard for the health and safety of others while attempting to satisfy the sexual fetishes of her lover caused personal injury to Mr. Howard when he contracted an STD from her during an encounter where the two engaged in unprotected sex.

210.        Although Mr. Howard met Ms. Ventura as a male companion, he was STD free and rarely had unprotected sexual contact. While engaged in the coercion of Mr. Combs and Ms. Ventura, Mr. Howard was in a committed monogamous relationship, which had begun before he met Ms. Ventura.

211.        Besides his partner, Ms. Ventura was the only other sexual partner Mr. Howard did not use condoms. During the time of contraction, Mr. Howard had been semi-retired as a male provider, with Ms. Ventura being his last client before he exited completely. He was gainfully employed, in a committed relationship with a partner, and he lived with them 7 days a week.

212.        Shortly after one encounter, Mr. Howard began to feel strange sensations when urinating. This quickly worsened, causing him to immediately consult a diagnostic center seeking to have his blood and urine tested. The results are returned with Mr. Howard having contracted Chlamydia.

213.        Several weeks later, when Mr. Howard saw Ms. Ventura again, the STD came up in conversation when Ms. Ventura revealed she had contracted it and politely

advised Mr. Howard to get himself checked, also blaming the infidelity committed by Mr. Combs for her infection.

214.         The reckless conduct of the Defendants jeopardized the health and well-being of Mr. Howard. Defendants' lifestyles and activities created the threat of substantial risk, which was minimized to Mr. Howard by the information the Defendants withheld.


## VIII.    Mr. Howard witnesses horrific acts of Domestic Violence against Ms. Ventura

215.     Over the span of a decade, Mr. Howard became an unwilling witness to numerous acts of physical domestic violence committed against Ms. Ventura.

216.     This violence has been attributed to forced labor and sexual acts of depravity, where Ms. Ventura claims she was forced to participate in sexual encounters.

217.     Mr. Howard's reality is far different from Ms. Ventura's. He recalls in vivid detail circumstances that differ greatly from what has been reported by Ms. Ventura regarding her abuse.

218.     Mr. Combs would assault Ms. Ventura in response to a variety of different factors. These included jealousy, arrogance, and perceived slights, perceived disrespect, perceived attempts to challenge him, and more.

219.     But during no encounter was Ms. Ventura ever assaulted for a perceived lack of interest, hesitation, poor performance, or direct refusal to engage in sexual encounters.

220.    Mr. Howard recalls Mr. Combs' assault Ms Ventura in NYC, after a perceived slight he falsely assumed to be validated. He did so by punching her twice in the chest in the presence of Mr. Howard.

221.    Mr. Howard would witness Mr. Combs grabbing, kicking, and shoving Ms. Ventura in response to the domestic arguments.

222.    On another occasion, Mr. Howard witnessed Mr. Combs assault Ms. Ventura for making Mr. Howard a drink despite being told by Mr. Combs not to.

223.    Another, Mr. Combs, assaulted Ms. Ventura because he assumed Ms. Ventura was mocking his penile size when he attempted to bed her immediately after Mr. Howard had finished.

224.    The instances of domestic violence and abuse experienced by Mr. Howard traumatized him for years after they occurred.

225.    Mr. Howard was made an unwillingness to witness and further victimized by this powerful couple who totally disregarded unless they needed his penis.

226.    When his penis was needed, he would be coerced, manipulated and then seduced into drug use and compliance.

227.    These acts and their traumatic effect entitle Mr. Howard to damages and relief within this action being put forth.

## IX.    Mr Howard Cooperates with the US Attorney for the Southern District of New York

228.    In mid-December 2023, agents from the Department of Homeland Security investigations contacted Mr. Howard regarding his encounter with Mr. Combs and Ms. Ventura, requesting that he come in for an interview.

229.    Having no experience in law at the time, Mr. Howard contacted his local criminal

attorney, who was also not an expert in federal criminal law.

230.    In response, the US Attorney's Office provided counsel to advise and represent

Mr. Howard during the interview for legal purposes.

231.    Mr. Howard spent the next year and a half as a cooperating government witness

for the Southern District of New York.

232.    Mr. Howard provided airline payment receipts, boarding passes, dates, and photos

of hotels to the government.

233.    More importantly, Mr. Howard provided corroboration of illegal activities. Mr.

Howard could corroborate a decade of illegal activity beginning in 2009 and

concluding in late 2019.

234.    During this time period, Mr. Howard witnessed assaults against Ms. Ventura, drug

use, and illegal activity, and witnessed.

235.    Mr. Howard was additionally drugged by both Ms. Ventura and Mr. Combs on

two separate occasions.

236.    Mr. Howard was the male provider who impregnated Ms. Ventura after an

encounter in October 2013.

237.    As the interview process progressed, Mr. Howard was asked for details as he

recalled them.

238.    Prosecutor Maurine Comey assisted Mr. Howard in a method of recollection by

instructing him during an interview to write down his memories as he recalled them,

due to the length of time that had elapsed since the conclusion of the relationship.

239.    Mr. Howard could then use these notes and present them to prosecutors, who would fact-check the dates and locations for evidence that supported his allegations.

240.    The US Attorney was able to establish Mr. Howard's credibility after investigating his claims.

241.    The US Attorney verified encounters at the Gramercy Park Hotel (NYC), Mandarin Hotel (Miami), The One Residences (Miami), The SLS (Miami), The London (NYC), The Essex House Hotel (NYC), The Intercontinental Hotel (NYC and Miami), The Trump Hotel (NYC), and the Downtown Beverly Hills Hotel (Los Angeles).

242.    Mr. Howard verified the sexual assault allegation within this complaint when he provided supporting travel fare receipts for his departure and arrival flights to Los Angeles on the morning he was assaulted.

243.    As the investigation continued, the US Attorney became aware of criminality in the actions of Ms. Ventura.

244.    Because Ms. Ventura was not the target of the investigation, Mr. Howard's allegations against her were not acted upon.

245.    Attorneys provided by the US Attorney worked to dissuade Mr. Howard from filing civil action against Mr. Combs and Ms. Ventura.

246.    The attorneys argued that allegations against Ms. Ventura would expose her to criminal liability and therefore might damage her credibility as a witness and her public image.

247.    Mr. Howard, as the client, directly instructed attorney Tyrone Blackburn to file his action against the defendants before the expiration of a statute made available to adult survivors of sexual assault in New York.

248.    Mr. Blackburn began as directed by first contacting attorney Douglas Wigdor, seeking to quietly settle litigation with Ms. Ventura and offering her the opportunity to avoid exposure to the allegations once the lawsuit was made public after filing.

249.    Instead of Mr. Wigdor embracing this opportunity to protect his client's image from allegations he knew to be true, he sought the assistance of the US Attorney to dissuade Tyrone Blackburn from filing until after the criminal trial of Sean Combs.

250.    This decision, although it protected Ms. Ventura's credibility before the trial, compromised Mr. Howard's legal action within the state of New York.

251.    Filing after the trial would mean Mr. Howard would lose his right to action in the state of New York under the applicable statute being used at the time.

252.    A calculated and coordinated effort has been made to protect Ms. Ventura from criminal liability that can be established.

253.    In protecting Ms. Ventura, the civil rights of Mr. Howard and other potential victims of Ms. Ventura who may exist and are entitled to civil action against her as their offender have been compromised.

254.    Ms. Ventura claims to have been forced, but despite her alleged trauma, she willingly and intentionally victimized, manipulated, and harmed others.

255.    Mr. Howard is entitled to justice under the same laws that provided justice to Ms. Ventura.

256.    Mr. Combs and Ms. Ventura should be held accountable for their actions jointly based on Mr. Howard's verified encounters and personal experiences, and should not be minimized due to the alleged victimhood of Ms. Ventura.

257.    Based on the factual allegations presented above, Mr. Howard incorporates all facts as his basis for the causes of action listed below.

258.    Mr. Howard seeks the justice of this court to provide that which has been denied by those who seek to conceal the truth in order to protect false information provided by the defendants.

## FIRST CAUSE OF ACTION
### Sex Trafficking under 18 U.S.C. § 1591, et seq.
### Against all Defendants

259.    Plaintiff repeats and realleges every allegation in all of the preceding paragraphs as if fully set forth herein.

260.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 (a) and (b) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

261.    The Defendants' acts and omissions, taken separately and/or together, as outlined above, constitute a violation of 18 U.S.C § 1595. Defendants Combs and Ventura, together as co-conspirators, perpetrated sex trafficking of Mr. Howard, coercing him into sexual acts by use of substances in multiple jurisdictions.

262.    The Defendants benefited by using Mr. Howard, often holding him for days to satisfy the sexual demands of Ms. Ventura while Mr. Combs watched. Ms. Ventura had autonomy. She made decisions, and she did what she wanted. There was abuse, but it was not because of forced sexual contact as she claimed.

263.    At all relevant times, Defendants Combs and Ventura participated in and facilitated the harboring and transportation of the Plaintiff for purposes of sex induced by fraud and coercion. There were no instances where Ms. Ventura appeared to be "forced" as she has claimed. By the account of Mr. Howard reported during numerous interviews to the US Attorney, Maurine Comey, and his allegations have never changed.  Ms. Ventura was an active and eager participant with autonomy and her own power. Mr. Combs played the protector amongst other roles.

264.    The Defendant Corporations have financially benefited and otherwise benefited as a result of these acts and omissions, aiding Ms. Ventura in her attempt to satisfy the sexual needs of Mr. Combs, the depraved, abusive and explosive owner of Defendant Corporations, be satisfied. They book rooms for the trafficked and provide supplies for the depravity.

265.    Defendants Combs and Ventura to include Defendants Bad Boy Records, Bay Boy Entertainment, and Doe Corps 1-10, formed a venture as defined by 18 U.S.C. §1591, given that they constituted a "group of two or more individuals associated in fact, whether or not a legal entity."

266.    As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered physical harm, severe emotional distress and anxiety, humiliation, embarrassment, post-traumatic stress disorder, and other consequential damages.

267.    Plaintiff seeks reasonable attorney fees should be obtain counsel to continue the matter on his behalf under 18 U.S.C. §1595(a)

## SECOND CAUSE OF ACTION
## CIVIL REMEDY FOR HUMAN TRAFFICKING

**(Florida Statute § 787.061)**
**Against all Defendants**

268.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

269.    At all times material hereto, Plaintiff was a "victim of human trafficking" as defined by Florida Statute § 787.06(2) and § 787.061(2)(b), having been subjected to coercion for the purpose of being used in human trafficking.

270.    Defendants engaged in "human trafficking" as defined by Florida Statute § 787.06(2), which includes but is not limited to:

a. Transporting, soliciting, recruiting, harboring, providing, enticing, maintaining, or obtaining another person for the purpose of exploitation of that person;

b. Using coercion to compel the Plaintiff to engage in commercial sexual activity;

c. Restraining, isolating, or confining or threatening to restrain, isolate, or confine the Plaintiff.

271.    Defendants' conduct constituted "coercion" as defined by Florida Statute § 787.06(2), including but not limited:

a. Restraining, isolating, or confining or threatening to restrain, isolate, or confine Plaintiff;

b. Enticing Plaintiff to engage in commercial sexual activity through deceptive or fraudulent means.

272.    As a direct and proximate result of Defendants' human trafficking, Plaintiff has suffered and continues to suffer economic damages, including but not limited to:

a. Past and future medical expenses;

b. Past and future mental health treatment expenses;

c. Lost wages and diminished earning capacity;

d. Costs and expenses incurred as a result of the human trafficking; and

e. Other reasonable costs and expenses incurred by Plaintiff.

273.    As a direct and proximate result of Defendants' human trafficking, Plaintiff has suffered and continues to suffer noneconomic damages, including but not limited to:

a. Pain and suffering;

b. Inconvenience;

c. Mental anguish;

d. Loss of capacity for enjoyment of life; and

e. Other nonfinancial losses.

274.    Defendants' conduct was intentional, willful, wanton, and malicious, warranting an award of punitive damages pursuant to Florida Statutes §§ 768.72, 768.725, and 768.73.

275.    Plaintiff is entitled to reasonable attorney fees should he retain and costs pursuant to Florida Statute § 787.061(3)(c).

276.    This action is timely filed pursuant to the statute of limitations set forth in Florida Statute § 95.11(8) or (10), as applicable and as referenced in Florida Statute § 787.061(4).

**THIRD CAUSE OF ACTION**
**CIVIL REMEDY FOR HUMAN TRAFFICKING**
**(California Civil Code § 52.5 - Human Trafficking)**
**Against all Defendants**

277.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

278.    At all times material hereto, Plaintiff was a victim of "human trafficking" as defined by California Civil Code § 52.5(a), having been subjected to acts that constitute human trafficking under California Penal Code §§ 236.1 or 236.2.

279.    Defendants engaged in "human trafficking" by:

a. Depriving or violating Plaintiff's personal liberty with the intent to obtain forced labor or services;

b. Depriving or violating Plaintiff's personal liberty with the intent to effect or maintain a felony violation of specified sexual offenses;

c. Using force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to obtain labor or services; and/or

d. Causing, encouraging, or facilitating the commercial sexual exploitation of Plaintiff.

280.    Defendants' trafficking conduct included, but was not limited to:

a. Transporting Plaintiff across state lines for commercial sexual exploitation;

b. Using promises of financial compensation and gifts to compel compliance];

c. Making false promises of legitimate employment,

d. Confiscating identification documents in the wallet when items were withheld;

e. Compelling Plaintiff to provide body fluids in separate containers for the Defendants' unknown enjoyment.

281.    Defendants used one or more of the following means to accomplish the trafficking:

a. Force, including physical restraint or physical harm;

b. Fraud, including false or deceptive offers of employment, marriage, or other relationships;

c. Coercion, including threats of harm to Plaintiff or others, debt bondage, or other means of control;

d. Violence or threats of violence;

e. Duress through unlawful pressure; and/or

f. Menace by way of threat, declaration, or act showing an intention to inflict an evil or injury.

282.    As a direct and proximate result of Defendants' human trafficking, Plaintiff suffered actual damages including:

a. General damages for physical and mental pain and suffering;

b. Medical and psychological treatment expenses;

c. Lost wages and diminished earning capacity;

d. Costs of reasonable relocation expenses;

e. Reasonable attorney fees; and

f. Other losses proximately caused by the trafficking.

283.    Defendant Beverly Hills Hotel, through its employee(s), had actual knowledge of or acted with reckless disregard toward sex trafficking activity occurring within the hotel premises.

284.    The employee's conduct directly contributed to or enabled the trafficking harm suffered by plaintiff

285.    Defendants' conduct was despicable and subject to contempt, warranting punitive damages to deter similar conduct.

286.    Plaintiff seeks restitution for the value of labor or services provided while being trafficked.

287.    Plaintiff is entitled to reasonable attorney fees as the prevailing party pursuant to California Civil Code § 52.5.

288.    Plaintiff seeks injunctive relief to prevent Defendants from engaging in further trafficking conduct.

## FOURTH CAUSE OF ACTION
### FEDERAL CIVIL REMEDY FOR HUMAN TRAFFICKING (18 U.S.C. § 1595 - Trafficking Victims Protection Act)
### Against all Defendants

289.    Plaintiff repeats and realleges every allegation in all of the preceding paragraphs as if fully set forth herein.

290.    At all times material hereto, Defendants violated one or more provisions of Chapter 77 of Title 18 of the United States Code (Peonage, Slavery, and Trafficking in Persons), specifically including but not limited to:

a.    18 U.S.C. § 1583 (Enticement into slavery);

b.    18 U.S.C. § 1589 (Forced labor);

c.    18 U.S.C. § 1590 (Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor);

d.    18 U.S.C. § 1591 (Sex trafficking  by force, fraud, or coercion); and/or

291.    Defendants engaged in sex trafficking in violation of 18 U.S.C. § 1591 by:

a. Knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting Plaintiff for the purpose of a commercial sex act;

b. Using means of force, threats of force, fraud, or coercion to cause Plaintiff to engage in commercial sex acts; and/or

c. Causing Plaintiff to engage in commercial sex acts when Plaintiff was under the age of 18 years.

292.    Defendants' conduct constituted a "commercial sex act" as defined by 18 U.S.C. § 1591(e)(3), meaning any sex act on account of which anything of value was given to or received by any person.

293.    Defendants used one or more of the following means prohibited by 18 U.S.C. § 1591:

a. Fraud: Scheme, plan, or pattern intended to cause Plaintiff to believe that failure to perform certain acts would result in serious harm or physical restraint;

c. Coercion: Threats of serious harm to or physical restraint against Plaintiff or another person, or any scheme, plan, or pattern intended to cause Plaintiff to believe that failure to perform an act would result in serious harm to or physical restraint against Plaintiff or another person; and/or

294.    Alternatively, or in addition, Defendants engaged in forced labor in violation of 18 U.S.C. § 1589 by knowingly providing or obtaining the labor or services of Plaintiff through one or more of the prohibited means set forth above.

295.    Defendants' conduct involved interstate or foreign commerce, including but not limited to:

a. Transportation of Plaintiff across state lines;

b. Use of interstate communication systems;

c. Other activities affecting interstate commerce.

296.    As a direct and proximate result of Defendants' violations of federal trafficking laws, Plaintiff has suffered damages including:

a. Medical expenses and costs of physical and occupational therapy or rehabilitation;

b. Mental health counseling and treatment expenses;

c. Lost income and diminished earning capacity;

d. Pain and suffering;

e. Emotional distress and mental anguish;

f. Loss of enjoyment of life;

g. Costs of relocation and temporary housing;

h. Legal fees and other litigation costs; and

i. Other losses proximately caused by the trafficking.

297.    Defendants' conduct was willful, wanton, malicious, and oppressive, warranting an award of punitive damages.

298.    Plaintiff is entitled to reasonable attorney fees pursuant to 18 U.S.C. § 1595(a).

299.    This action is timely filed within the 10-year statute of limitations provided by 18 U.S.C. § 1595(c), which runs from the date on which the cause of action arose or the date on which Plaintiff reasonably discovered the cause of action, whichever is later.

## FIFTH CAUSE OF ACTION
**Sexual Assault pursuant to The California Sexual Abuse and Cover Up Accountability Act, (Cal. Civil Proc. § 340.16)**
**All Defendants**

300.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

301.        Defendant Ms. Ventura subjected the Plaintiff to sexual abuse, sexual

battery and rape forcing a sexual act upon him during her menstrual cycle, as defined

in Cal. Penal Code §§ 234. 4, 261, and 289. In knowingly committing this act Ms.

Ventura did cause harmful and sexually offensive contact with their person and placed

Mr. Howard in apprehension of such contact.

302.        Defendant Combs witnessed this encounter and attempted to "cover up" the

matter, offering the Plaintiff additional monetary compensation for the actions of Ms.

Ventura. During the conversation, Mr. Combs confessed that Ms. Ventura was aware

of her monthly cycle, but was intoxicated and "horney", she had hoped that once she

began, I would not mind. Ms. Ventura acknowledged this eventually, but did not

apologize until the following morning, citing intoxication as an excuse for her actions

the night before

303.        Defendant Corporations were entities engaged in a "cover up" as defined

in Cal. Civil Code § 340.16(4)(A), because Defendant Corporations financed the

accommodations of the Plaintiff and took no efforts to protect the Plaintiff from harm

by Ms. Ventura, who was employed by the Corporations.

304.        As a direct result of the actions of the Defendants' unlawful, drug-fueled,

and sexual depraved conduct as alleged hereinabove, Plaintiff has suffered physical

injury, severe emotional distress and anxiety, humiliation, embarrassment, post-

traumatic stress disorder, economic harm and other consequential damages.

<u>**SIXTH CAUSE OF ACTION**</u>
**CIVIL LIABILITY FOR VIOLATIONS OF NEW YORK PENAL LAW § 230.34 - SEX**
**TRAFFICKING**
**All Defendants**

42

305.      Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

306.    Plaintiff brings this civil action for damages pursuant to the civil remedies available under New York law for victims of criminal conduct, seeking compensation for injuries suffered as a direct result of Defendant's violations of Penal Law § 230.34.

307.    At all times relevant hereto, Plaintiff was an adult resident of New York City, New York

308.    Beginning around June 2012, and lasting until 2019, with the last occurrence being December 2019, Defendants engaged in sex trafficking in violation of New York Penal Law § 230.34 by intentionally advancing or profiting from prostitution by:

    a) Managing, supervising and controlling acts of prostitution or an enterprise involving the prostitution activity of Plaintiff; and/or

    b) Compelling a person by force or intimidation to engage in prostitution; and/or

    c) Knowingly advancing or profiting from prostitution

309.    Defendant's sex trafficking activities included, but were not limited to:

    a)   Managing/Supervising/Controlling Prostitution:

    b)   Organizing and directing Plaintiff's commercial sexual activities

    c)   Maintaining operational control over the prostitution enterprise

310.    Transportation and Movement:

    a.   Transporting Plaintiff from New York City, New York to Miami, Florida for the purpose of commercial sexual exploitation

     b.   Arranging housing and logistics to facilitate continued prostitution activities

     c.   Maintaining control over Plaintiff's movements and location

311.    Force and Intimidation employed by Defendant included:

     a.   Psychological coercion: Mr. Howard would be isolated inside located hotel suites where his clothing and communication devices were withheld by the Defendants. He was constantly on alert due to the violent outburst, and drug-fuel mood swings of the Defendants.

     b.   Economic control: Money was used as a tool to coerce and been Mr. Howard to the will of the Defendants. Once under there control, Mr. Howard was pressured and/or coerced into compliance.

     c.   Substance abuse facilitation: Designer drugs were used by the Defendants to lower the natural resistance of Mr. Howard. The Drugs were further used to keep Mr. Howard awake and at the service of the Defendants.

312.    Through these acts of force and intimidation, Defendant compelled Plaintiff to engage in prostitution against Plaintiff's will.

Interstate Nature and Continuing Course of Conduct

313.    Defendant's trafficking scheme involved the interstate transportation of Plaintiff from New York to Florida, demonstrating the scope and sophistication of the trafficking operation.

314.    The trafficking constituted a continuing course of criminal conduct that began in New York and continued in Florida, with Defendant maintaining control and profiting throughout.

Proximate Cause and Damages

315. As a direct and proximate result of Defendant's violations of New York Penal Law

§ 230.34, Plaintiff suffered severe and continuing damages, including:

   a. Physical Injuries

   b. Physical trauma

   c. Medical expenses for treatment of injuries

   d. Ongoing medical care

Psychological Harm:

   a. Severe emotional distress and psychological trauma

   b. Post-traumatic stress disorder (PTSD)

   c. Depression, anxiety, and other mental health conditions

   d. Costs of psychological treatment and therapy

Economic Damages:

   a. Diminished earning capacity

   b. Loss of educational and career opportunities

Other Consequential Damages:

   a. Pain and suffering

   b. Loss of enjoyment of life

316. The plaintiff's damages are ongoing and continue to accrue as a result of the

lasting after effects of Defendant Sean Combs criminal trial. After being exposed

through the allegations of Ms. Ventura and an investigation by the US Attorney, Mr.

Howard name has been connected to the criminality of the Defendants

Prayer for Relief

**SEVENTH CAUSE OF ACTION**
**Violation of New York State Human Rights Law,**
**Exec. Law §§ 290, et seq. ("NYSHRL")**
**Against All Defendants**

317.    Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

318.    At all times relevant hereto, Defendant was an employer within the meaning of

New York Executive Law § 292(5), employing four or more persons.

319.    At all times relevant hereto, Plaintiff was an employee within the meaning of New

York Executive Law § 292(6).

320.    The New York State Human Rights Law prohibits employers from discriminating

against employees on the basis of race and domestic violence victim status.

321.    Defendant, through its agents, servants, and employees, unlawfully discriminated

against Plaintiff on the basis of race and domestic violence victim status.

322.    Defendant's discriminatory conduct was intentional, willful, wanton, and

malicious.

323.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff

has suffered and continues to suffer damages including, but not limited to:

a. Emotional distress, humiliation, and mental anguish;

b. Other economic and non-economic damages.

324.    Defendant's conduct was egregious and undertaken with malice, reckless

indifference, or callous disregard for Plaintiff's rights, warranting an award of

punitive damages.

**EIGHTH CAUSE OF ACTION**
**New York Services for Victims of Human Trafficking,**
**N.Y. Servs law § 483-BB**

**Against All Defendants**

325.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

326.    At all times relevant hereto, New York Services Law § 483-BB was in full force and effect.

327.    New York Services Law § 483-BB creates a private right of action for victims of human trafficking and provides that any person who is a victim of conduct that would constitute a violation of the human trafficking laws may bring a civil action in any court of competent jurisdiction.

328.    The statute defines human trafficking to include labor trafficking, which encompasses the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

329.    Defendant, through its agents, servants, and employees, engaged in conduct constituting human trafficking by coercing and orchestrating the transportation of the Plaintiff across state line for purposes of a commercial sex act.

      a. Using force, fraud, or coercion to compel Plaintiff to provide labor or services;

      b. Harboring and/or maintaining Plaintiff in a condition of forced labor;

      c. Obtaining labor or services from Plaintiff through threats, physical restraint, or abuse of legal process;

330.    Defendant's conduct was undertaken knowingly and with the intent to subject Plaintiff to involuntary servitude, forced labor, or other forms of human trafficking.

331.    As a direct and proximate result of Defendant's trafficking conduct, Plaintiff has
suffered and continues to suffer severe damages including, but not limited to:

    a. Physical and psychological injury;

    b. Lost wages and benefits;

    c. Medical expenses;

    d. Pain and suffering;

    e. Emotional distress and mental anguish;

    f. Loss of enjoyment of life;

    g. Other economic and non-economic damages.

332.    Defendant's conduct was egregious, intentional, and undertaken with malice or
reckless disregard for Plaintiff's rights and well-being.

333.    Plaintiff is entitled to recover damages, including punitive damages, reasonable
attorney's fees, and costs pursuant to N.Y. Servs. Law § 483-BB.

334.    Plaintiff's claims under this statute are not subject to any statute of limitations that
would otherwise apply, as N.Y. Servs. Law § 483-BB provides an extended
limitations period for trafficking victims.

## PRAYER FOR RELIEF

335.    **WHEREFORE**, Plaintiff respectfully demands judgment against Defendant as
follows:

    A. Compensatory damages in an amount to be proven at trial, including
but not limited to:

        1.  Past and future medical expenses

        2.  Past and future lost earnings and diminished earning capacity

3. Pain and suffering

4. Emotional distress damages

B. Punitive damages to punish Defendant's egregious criminal conduct

and deter similar future conduct;

C. Pre- and post-judgment interest as provided by law;

D. Costs and reasonable attorney's fees;

E. Punitive damages pursuant to Florida Statutes §§ 768.72, 768.725, and

768.73;

F. Such other and further relief as this Court deems just and proper.

Dated: June 29, 2025

Respectfully submitted,

*Clayton Howard*

Clayton Howard, Pro Se

Clayton Howard
24 Orchard Street
Carteret, New Jersey 07008
itsclaytonhoward@gmail.com
(929)781-7791
Pro se