UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FILED

CLERK, U.S. DISTRICT COURT

12/16/2025

CENTRAL DISTRICT OF CALIFORNIA

BY ____DC____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

-------------------------------------------------------x

| | | |
|---|---|---|
| CLAYTON HOWARD | **:** | Civil Case No: CV25-06031-AH(JPRx) |
| *Plaintiff,* | : | |
| | : | |
| | : | |
| v. | : | THIRD AMENDED COMPLAINT |
| | : | JURY TRIAL DEMAND |
| SEAN COMBS, CASANDRA VENTURA, | : | |
| BAD BOY RECORDS, | : | |
| COMBS ENTERPRISES, | : | |
| *Defendants,* | : | |

-------------------------------------------------------x

**TRIGGER WARNING: THIS DOCUMENT CONTAINS GRAPHIC INFORMATION OF A SEXUAL NATURE, INCLUDING SEXUAL ASSAULT**

Plaintiff Clayton Howard (a.k.a "Dave" and "Mr. Howard") hereby alleges, as and for his Complaint against Defendants Sean Combs ("Mr. Combs"), Cassandra Ventura ("Ms. Ventura"), Bad Boy Entertainment, Bad Boy Records, Combs Enterprises, LLC, and Doe Corporations 1-10 (together, "Defendant Corporations," and together with Mr. Combs and Ms. Ventura, "Defendants") as follows:

PRELIMINARY STATEMENT

1. Plaintiff Mr. Howard brings this civil action against Defendants arising from an eight-year period of systematic sexual exploitation, trafficking, and abuse that occurred between approximately 2009 and 2019. This case exposes the truth behind the widely publicized narrative surrounding Defendant Ventura's civil settlement and the criminal prosecution of Defendant Combs.

2. Defendant Sean Combs is a prominent rapper and record executive known by his stage names "Puff Daddy," "P. Diddy," or "Diddy," who rose to fame in the early 1990s with his record label Bad Boy Records.

3. Defendant Cassandra Ventura, known professionally as "Cassie," is a singer, actress, and model who gained prominence in the early 2000s with her single "Me and You."

4. Defendants maintained a highly publicized romantic relationship from 2007 to 2018, during which both were addicted to opiates and methamphetamines. Their relationship was characterized by sexually explicit activity categorized as "swinging," with Defendant Combs harboring a specific fetish for voyeurism. The relationship was abusive, with Defendant Combs frequently physically assaulting Defendant Ventura during domestic incidents.

The Misleading Public Narrative

5. In late 2023, Defendant Ventura filed a civil action against Defendant Combs pursuant to the Gender Motivated Violence Act, alleging that Combs manipulated, abused, and controlled her for over a decade through violent behavior and disturbing demands. The parties settled this action within 24 hours for twenty million dollars.

6. Subsequently, the Office of the U.S. Attorney for the Southern District of New York arrested and indicted Defendant Combs for sex trafficking and violations of the Mann Act, with the prosecution's foundation based largely on Defendant Ventura's allegations.

7. Contrary to the narrative presented in Defendant Ventura's civil complaint and the subsequent criminal prosecution, the truth reveals a far more complex reality. Defendant Ventura was not merely a victim forced into sexual encounters with male escorts, but rather an active and engaged participant who willingly manipulated and exploited others, including Plaintiff, to satisfy the sexually depraved desires of Defendant Combs and herself.

8. For more than eight years, Defendants operated a scheme whereby they systematically
   exploited Plaintiff through manipulation, coercion, controlled substances, and threats of
   violence to engage in non-consensual sexual activities for their gratification and
   commercial purposes. Defendant Ventura accomplished this exploitation by concealing
   her identity and fabricating the narrative that she and Defendant Combs were "married,"
   using this deception to entice men into drug use and sexual encounters.

9. Defendants drugged Plaintiff with controlled substances, including MDMA in doses three
   times stronger than what Defendant Ventura herself consumed, to lower his inhibitions
   and facilitate sexual exploitation. Defendant Ventura used these substances strategically,
   "like a spider catching its prey in its web," to manipulate Plaintiff into unprotected sexual
   contact designed to please Defendant Combs.

The December 2012 Paradigmatic Incident

10. In December 2012, Defendants orchestrated a sequence of events that exemplifies the
    systematic nature of their trafficking enterprise and directly caused concrete economic
    injury to Plaintiff. Defendants instructed Plaintiff to meet them for what was described as
    a brief encounter, then immediately confiscated his clothing, identification, and cellular
    telephone upon arrival.

11. Despite representing the encounter would be brief, Defendants detained Plaintiff for
    hours past the agreed time, extending well into early morning. When Plaintiff was finally
    permitted to leave at approximately 5:00 a.m., it was hours past his required parole
    curfew time.

12. As a direct and foreseeable consequence of Defendants' coerced detention past curfew,
    Plaintiff proceeded directly to his job site in Harlem rather than return home. While
    driving to his workplace, Plaintiff was detained during a traffic stop and subsequently
    arrested for the parole violation.

13. Upon learning of Plaintiff's arrest, Defendant Combs orchestrated the bail payment as
    part of the enterprise's control mechanisms. Specifically, Defendant Combs arranged for
    a Bad Boy Entertainment employee to meet with Plaintiff's mother, Maggie Howard, and
    Lamont Allen at the London Hotel to provide the $5,000.00 cash bail payment.

14. This bail orchestration served multiple enterprise purposes: (1) creating a sense of
    indebtedness in Plaintiff toward Defendants, (2) demonstrating the enterprise's power and

reach, (3) ensuring Plaintiff's continued availability for trafficking purposes, and (4)
maintaining control over a valuable trafficking victim.

15. Within three weeks following his release, Defendants transported Plaintiff from New
York to Miami, Florida, demonstrating the enterprise's immediate reassertion of control.
This interstate transportation immediately following the bail payment was a predicate act
of sex trafficking under 18 U.S.C. § 1591 and violated the Mann Act, 18 U.S.C. § 2421.

16. As a direct and proximate result of the curfew violation caused by Defendants' coerced
overnight detention, Plaintiff was found in violation of his New York State Parole
conditions, resulting in Plaintiff's immediate termination from his employment with
Optyc Inc., where he had been gainfully employed.

17. The loss of employment and legitimate income created severe financial vulnerability that
the enterprise specifically and deliberately exploited to maintain Plaintiff's participation
in the trafficking scheme. Defendants employed Plaintiff's financial desperation—created
by their own prior conduct—as a primary means of coercion to force him back into the
sex trafficking enterprise.

18. The employment termination and resulting financial desperation constituted concrete
injury to Plaintiff's business and property interests within the meaning of 18 U.S.C. §
1964(c). The temporal sequence—coerced detention leading to curfew violation, leading
to arrest, leading to parole violation, leading to job loss, leading to financial vulnerability,
leading to forced re-entry into trafficking scheme—establishes direct causation between
the RICO predicate acts and Plaintiff's economic damages.

Sexual Assault and Non-Consensual Recording (2009-2016)

19. Over the years, Plaintiff was sexually assaulted by Defendant Ventura, who would
manipulate and force herself upon Plaintiff during her menstrual cycle against his will.
Defendants filmed Plaintiff in compromising encounters without his consent for years,
creating recordings that the couple would watch together after the encounters ended and
use for mutual masturbation.

20. When Plaintiff confronted Defendant Ventura about the recording and vocalized his
desire not to be recorded, she opened her MacBook to a previous recording and
masturbated to climax in front of Plaintiff while watching an encounter involving the two
of them, demonstrating the extent of her manipulation and control.

Commercial Sex Trafficking and RICO Enterprise (2012-2019)

21. The Defendants, through the use of their resources and means, operated a decade-long sex trafficking ring where they manipulated male entertainers into sexual encounters using promises of money and favors.

22. The Defendants orchestrated a scheme by which male entertainers would be contacted, misled into believing the Defendants were in monogamous relationships, coerced into alcohol and drug use, and then manipulated into sexual encounters with the female defendant while Mr. Combs watched.

23. This sex trafficking enterprise lasted for over a decade, with dozens of male entertainers being lured into the scheme. Defendant Ventura personally trafficked multiple victims using identical fraudulent recruitment schemes, including Jules Theodore, Daniel Phillip, Jonathan Odie, Sharay "The Punisher" Hayes, and numerous other men.

24. For more than five years, Defendants trafficked Plaintiff for purposes of commercial sex, using him as entertainment to satisfy their sexual fetishes and personal ambitions. The couple drugged, manipulated, and traumatized Plaintiff while themselves engaging in a toxic, domestically abusive relationship that often became violent.

Obstruction of Justice and Witness Manipulation

25. Plaintiff's ability to seek timely legal recourse was deliberately frustrated through a coordinated effort involving his former counsel, who communicated with federal prosecutors without Plaintiff's presence. The Plaintiff was advised to remain silent and was manipulated into inaction, with his attorney intentionally delaying action to protect Defendant Ventura's credibility.

26. Despite serving as a compliant witness for the government and providing information that was later corroborated by investigators, federal prosecutors ultimately withheld Plaintiff's testimony despite its corroborative value and his valid allegations against both Defendants.

Denial of Justice and Present Claims

27. For many years, Plaintiff has lived with this trauma in silence, forced to endure the psychological and physical consequences with no visible avenue for justice. While Defendant Ventura's allegations have destroyed Defendant Combs's career, she has

escaped liability by using allegations of abuse to avoid criminal responsibility for her own actions.

28. This action seeks declaratory, injunctive, and monetary relief under federal sex trafficking statutes (18 U.S.C. § 1591 et seq.), the California Trafficking Victims Protection Act (Cal. Civ. Code § 52.5), Sexual Assault pursuant to The California Sexual Abuse and Cover Up Accountability Act (Cal. Civ. Proc. § 340.16), New York Services for Victims of Human Trafficking (N.Y. Servs. Law § 483-BB), and CIVIL RICO VIOLATION of 18 U.S.C. § 1962(c), for the severe psychological, physical, and dignitary harms Plaintiff suffered during this prolonged period of exploitation and abuse.

## JURISDICTION AND VENUE

29. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this action asserts violations of 18 U.S.C. §1591, et seq., and therefore raises federal questions regarding the deprivation of Plaintiff's rights. The Court has supplemental jurisdiction over the Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

30. Under 28 U.S.C. § 1391(a)(2) and (b), venue is proper in this Court because all Defendants are residents of the State in which the district is located.

## PARTIES

31. Plaintiff, Clayton Howard (Mr. Howard), is a resident of New Jersey. Beginning in fall 2009, he accepted work as an independent male companion in New York. Under the alias "Dave," he saw clients for almost sixty (60) days before he met the Defendants. Mr. Howard was recruited and manipulated by the defendants Sean Combs, Cassandra Ventura, Bad Boy Records LLC, and Bad Boy Entertainment and its related entities beginning in 2009, and concluding in 2019.

32. Defendant Sean Combs, upon information and belief, currently resides within the Metropolitan Detention Center in New York, where he awaits sentencing for matters related to this action. At all relevant times herein, Mr. Combs met the definition of an "employer" of the Plaintiff under relevant statutes.

33. Defendant Cassandra Ventura, upon information and belief, resides within the State of California. At all relevant times herein, Ms. Ventura met the definition of an "employer" of the Plaintiff under relevant statutes.

34. Defendant Bad Boy Entertainment is a music, media, and entertainment company founded by Defendant Sean Combs, which includes the record label Defendant Bad Boy Records LLC. At all relevant times, Defendant was an "employer" of the Plaintiff within the meaning of all applicable statutes.

35. Defendant Bad Boy Records LLC is a Delaware limited liability company with its principal place of business located in New York. At all relevant times, Defendant was an "employer" of the Plaintiff within the meaning of all applicable statutes.

36. Defendant Combs Enterprises, LLC is a New York limited liability company. At all relevant times, Defendant was an "employer" of the Plaintiff within the meaning of all applicable statutes.

## FACTUAL ALLEGATIONS

Initial Meeting and Fraudulent Recruitment (2009)

37. Mr. Howard ("Dave") met Ms. Ventura ("Jackie Star") in late 2009. Ms. Ventura invited Mr. Howard to The London hotel in New York City to serve as a male companion.

38. Ms. Ventura concealed her identity using makeup, a large red wig, and dim lighting, and failed to inform Mr. Howard that another party would be present. Ms. Ventura offered Mr. Howard alcohol and marijuana, then they spoke for approximately thirty minutes.

39. Ms. Ventura requested Mr. Howard's personal identification for safety purposes. Mr. Howard provided his N.Y.S. Driver's License revealing his true identity. Ms. Ventura then requested that Mr. Howard expose his genitals, and under the influence of substances, Mr. Howard complied.

40. Ms. Ventura revealed her "husband" was upstairs and had consented to her having a male companion. Ms. Ventura explained they participated in "the Lifestyle" and her "husband" preferred to watch her with men with larger reproductive organs. Ms. Ventura stated she preferred men with darker complexions and complimented Mr. Howard's complexion.

41. Ms. Ventura introduced Mr. Combs as her "husband" under the alias "Frank." Mr. Combs retrieved baby oil and Astroglide lubricant from a platter and retreated to a darkened corner with poor lighting. Mr. Howard was instructed not to address Mr. Combs directly and to speak only to Ms. Ventura.

42. Mr. Combs concealed his identity with a baseball cap and cloth covering his face. When Mr. Combs spoke, it was to inquire about Ms. Ventura's needs. Mr. Combs provided "direction" to both parties, regulating the pace of physical contact.

The Encounter Structure (2009-2017)

43. This first encounter established the structure for all subsequent encounters. Mr. Howard had no autonomy and was required to follow orders. Financial compensation was used as a form of dominance.

44. Mr. Howard was instructed to remove all clothing and surrender his clothing and phones to Ms. Ventura. Mr. Howard's cellphone was turned off and surrendered, preventing him from leaving safely. Some suites required keys for floor access with no stairwell access without triggering alarms.

45. Mr. Howard was instructed to apply baby oil to his nude body. Ms. Ventura would saturate Mr. Howard with oil and apply it herself, often spraying Mr. Howard with oil during application.

46. Defendants structured encounters into four phases: (1) no touch, (2) soft foreplay, (3) fellatio, and (4) intercourse, directed by Mr. Combs. Mr. Howard had no input and was expected to comply. Through manipulation and financial coercion, Mr. Howard remained in these phases for hours.

47. Ms. Ventura controlled the start and sought Mr. Combs' permission to progress. If Mr. Combs wasn't ready, he would refuse permission but often granted masturbation permission. Mr. Combs controlled progression and pace, seeking to control Ms. Ventura's desires while pleasuring himself.

48. Prolonged masturbation sessions caused skin tears and scabs on Mr. Howard's penis, causing severe pain and scarring. While Mr. Howard stood covered in oil, both Defendants would masturbate while watching him. Both Defendants would be intoxicated using substances and alcohol.

49. Specific drugs included Ecstasy, GHB, Ketamine, Cocaine, MDMA (Molly), and Marijuana. Ms. Ventura would orally pleasure Mr. Howard for periods exceeding one hour. Dehydrated from drugs and lack of water, Ms. Ventura would perform oral sex until her jaw became sore.

50. Ms. Ventura's arousal would be heightened, and she would beg Mr. Combs to allow intercourse. Mr. Howard was directed to engage until Ms. Ventura climaxed. Ms. Ventura controlled the degree of intimacy, including whether to engage in unprotected sex.

51. Once Ms. Ventura climaxed, the cycle would repeat. One encounter could consist of 15-30 individual sessions, each including all four stages. The number of sessions depended on how many days Mr. Howard was detained.

MDMA Use and Unprotected Sex (2011-2016)

52. Mr. Howard did not engage in harder drugs for the first two years until offered by Ms. Ventura. During an encounter during the later part of 2011, Ms. Ventura offered Mr. Howard ecstasy, claiming it was light and harmless. Mr. Howard later learned Ms. Ventura had tripled his dosage to get him "freaky" and increase encounter intensity.

53. During a late 2011 encounter, Mr. Howard was given ecstasy after complaining of exhaustion. When Mr. Howard complained about pills, Ms. Ventura crushed it into a drink, claiming only a small dosage. Having known Ms. Ventura for years, Mr. Howard trusted her and consumed the drink.

54. Mr. Howard began feeling hot and sweating uncontrollably within moments. When he complained, Ms. Ventura responded with a passionate kiss and aggressive oral contact. Mr. Howard never felt so intoxicated, with the drug enhancing all senses and sexual desires.

55. They began with condoms, but Ms. Ventura removed them and pressured unprotected contact while Mr. Howard's inhibitions were lowered. The encounter lasted over two days while Mr. Combs watched and occasionally engaged Ms. Ventura.

56. When Mr. Howard saw Ms. Ventura again, she revealed she had contracted Chlamydia and advised him to get checked, blaming Mr. Combs' infidelity for her infection. After one encounter in 2016, Mr. Howard felt strange sensations when urinating, which worsened. Results showed he had contracted Chlamydia.

57. In October 2012, Mr. Howard impregnated Ms. Ventura at the Gramercy Park Hotel in Manhattan, NY. Ms. Ventura decided to abort when unable to locate him. After an eight-month separation, Ms. Ventura confessed at Gramercy Park Hotel that she had aborted

Mr. Howard's pregnancy. Despite this revelation, Ms. Ventura insisted on unprotected sex during that encounter, which lasted several days.

Drugging by Mr. Combs (Fall 2015)

58. During an encounter in the fall of 2015, Mr. Howard was drugged by Mr. Combs at the Trump property at Columbus Circle in New York City. Mr. Combs offered Mr. Howard a pink substance in a small plastic bag described as "Pink MDMA" or "Pink Molly."

59. Mr. Combs hinted at Ms. Ventura's insistence on indulgence, explaining she may be angry if he didn't partake. Against better judgment, Mr. Howard agreed to consume a small dosage.

60. Mr. Combs retreated to the master suite, and within minutes Mr. Howard became extremely warm and began sweating uncontrollably. He began having violent spasms, forcing him to crawl to a nearby bathroom. Neither Ms. Ventura nor Mr. Combs exited the master suite.

61. Mr. Howard began vomiting uncontrollably in the bathroom. The stomach pain was intense and sweating wouldn't stop. Vomiting lasted several minutes until nothing was left. Mr. Howard lay dizzy and weak on the bathroom floor before regaining strength.

62. When Ms. Ventura asked what was wrong, Mr. Howard blamed what Mr. Combs had given him. Ms. Ventura asked Mr. Combs what he had given Mr. Howard; he responded "the pink shit." When Mr. Howard said Mr. Combs told him it was "Molly," Ms. Ventura informed him it was not "Molly."

63. Mr. Howard was given around $1,500 and released. He walked over forty city blocks in December conditions, sweating uncontrollably and afraid. Around Union Square, he regained enough composure to call a friend for help.

Sex Trafficking to Miami and Los Angeles (2012-2019)

64. Beginning in early 2012, Ms. Ventura and Mr. Combs began to fly Mr. Howard from New York City to Miami and Los Angeles numerous times. In the beginning, Ms. Ventura used promises of gifts, money, and vacations to coerce Mr. Howard into agreeing to leave NYC.

65. The trafficking for purposes of sexual contact began after Mr. Howard's "victory" over Daniel Phillip in a prolonged sexual encounter where the two men competed. As his

"reward," he began receiving perks like travel and small gifts from Ms. Ventura, which were tools used to manipulate Mr. Howard into compliance.

66. The first trafficking incident occurred when flown to Miami from New York after Ms. Ventura's call. A JetBlue flight was booked and paid for by Ms. Ventura. Mr. Howard met the couple at the Mandarin hotel in Miami. Mr. Howard checked into a suite under the name "Frank Black," given by Ms. Ventura.

67. During all trafficking instances, Mr. Howard was presented to hotel staff as "Security" for Bad Boy Records. Mr. Howard would spend days servicing Ms. Ventura, waiting to be released. He was asked to come for one day, he wasn't released until three days later.

68. Mr. Howard was flown to Miami many times, induced into drug use, alcohol consumption, and prolonged unprotected sexual activity. Ms. Ventura repeatedly stated she "hated condoms and they irritated her."

69. During the period in Miami following the December 2012 arrest and bail orchestration, Plaintiff discovered that Defendant Ventura was pregnant. The discovery of Defendant Ventura's pregnancy added an additional layer of emotional coercion and manipulation that the enterprise exploited to ensure Plaintiff's continued compliance.

Sexual Assault in Los Angeles (October 2014)

70. Defendants sex trafficked Mr. Howard to Los Angeles and brought him to the Beverly Hills Hotel. Upon arrival, Mr. Howard was instructed to wait, but he went outside feeling uncomfortable. Mr. Combs contacted him and instructed him to reenter the hotel.

71. Ms. Ventura was angry with Mr. Howard for choosing to spend his anniversary with his partner instead of flying to Los Angeles. Through manipulation, physical positioning, and Mr. Combs' presence, Ms. Ventura forced a sexual encounter.

72. She seduced him into compliance and removed his clothing. She manipulated him through foreplay into a compromised position on the sofa. She began kissing him, attempting to arouse him into sexual activity.

73. Mr. Howard repeatedly asked her to wait, but Ms. Ventura ignored him, pinning him to the couch. Ms. Ventura took hold of Mr. Howard's penis and inserted it into herself. The sensation overwhelmed Mr. Howard, causing motor function difficulties.

74. Ms. Ventura finished quickly, allowing Mr. Howard to remove her and reach for the light. Mr. Howard discovered Ms. Ventura was menstruating heavily. Ms. Ventura

pretended to be surprised but later revealed she was aware but didn't think it would be "heavy."

75. Mr. Howard became angry and asked why she would do that to him. Ms. Ventura, drunk and intoxicated, laughed and said it wasn't a big deal. An argument ensued, cut short by Mr. Combs, who called Ms. Ventura into the bedroom after apologizing to Mr. Howard.

76. When Ms. Ventura reentered, Mr. Combs admitted she was aware but intoxicated and disregarded Mr. Howard's feelings, providing substantial bills and asking him to go to his prepared suite. Ms. Ventura later apologized, blaming intoxication and hormones.

Miami Sexual Proposition (March 2016)

77. Mr. Howard was coerced by Defendant Ventura into traveling from New York to Florida during March 2016 for the Ultra Weekend Music Festivities. During this encounter at the SLS property located along Collins Avenue, Mr. Combs directly inquired into the Plaintiff's sexuality.

78. Mr. Combs, visibly intoxicated, asked the Plaintiff if he was "Gay" while sitting on a piano stool. Mr. Howard recalls becoming angry, cursing, and questioning Mr. Combs as to what would make him consider this. Ms. Ventura entered the room, witnessing the entire exchange.

79. Mr. Combs presented Mr. Howard with a wad of cash to "Shut-up," which Mr. Howard admits he did. Several moments later, while engaged in relations with Ms. Ventura, Mr. Combs attempted to manipulate Mr. Howard by using his rectum, blocking the view of Ms. Ventura.

80. Mr. Howard felt this was done intentionally, to force his focus on the rectum of Mr. Combs. Mr. Howard feels Mr. Combs attempted to sexually manipulate him into an encounter. This experience left Mr. Howard traumatized for years.

Domestic Violence Witnessed (2011-2016)

81. Over a decade, Mr. Howard witnessed numerous acts of physical domestic violence against Ms. Ventura. Mr. Combs would assault Ms. Ventura due to jealousy, arrogance, perceived slights, disrespect, and attempts to challenge him.

82. Ms. Ventura was never assaulted for lack of interest, hesitation, poor performance, or refusal to engage sexually. Mr. Howard recalls Mr. Combs punching Ms. Ventura twice

in the chest in NYC after a perceived slight. Mr. Howard witnessed Mr. Combs grabbing, kicking, and shoving Ms. Ventura during domestic arguments.

83. Mr. Combs assaulted Ms. Ventura for making Mr. Howard a drink despite being told not to. Mr. Combs assaulted Ms. Ventura because he assumed she was mocking his penile size when he attempted to bed her after Mr. Howard finished.

Federal Cooperation and Criminal Prosecution (2023-2025)

84. In mid-December 2023, Department of Homeland Security agents contacted Mr. Howard regarding his encounters with defendants, requesting an interview. The US Attorney's Office provided counsel to advise Mr. Howard during the interview.

85. Mr. Howard spent the next year and a half as a cooperating government witness for the Southern District of New York. Mr. Howard provided airline receipts, boarding passes, dates, and hotel photos to the government. Mr. Howard provided corroboration of illegal activities spanning from 2009 to late 2019.

86. Mr. Howard witnessed assaults against Ms. Ventura, drug use, and illegal activity. Mr. Howard was drugged by both defendants on separate occasions. Mr. Howard was the male provider who impregnated Ms. Ventura after an October 2012 encounter.

87. Prosecutor Maurine Comey assisted Mr. Howard's recollection by instructing him to write down memories due to elapsed time. Mr. Howard could present these notes to prosecutors, who would fact-check dates and locations.

88. The US Attorney established Mr. Howard's credibility after investigating his claims. The US Attorney verified encounters at multiple hotels: Gramercy Park Hotel (NYC), Mandarin Hotel (Miami), The One Residences (Miami), The SLS (Miami), The London (NYC), The Essex House Hotel (NYC), The Intercontinental Hotel (NYC and Miami), The Trump Hotel (NYC), and Beverly Hills Hotel (Los Angeles).

89. On or about July 2, 2025, Defendant Sean Combs was convicted by jury verdict in the Southern District of New York on COUNT III: INTERSTATE TRANSPORTATION FOR PROSTITUTION in violation of 18 U.S.C. § 2421 et seq.

90. Plaintiff Clayton Howard is specifically named as a VICTIM of COUNT III in the Government's Sentencing Memorandum filed in United States v. Sean Combs, No. 24-cr-00542 (S.D.N.Y.).

91. As a federally designated victim in the criminal prosecution, Plaintiff is entitled to rights under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771.

92. Plaintiff's victim status establishes: (1) Standing: Federal jury determination that Plaintiff is "victim" establishes prima facie standing for civil claims; (2) Collateral Estoppel: Conviction on COUNT III collaterally estops Defendants from denying interstate transportation; (3) Credibility: Federal prosecutors' victim designation after investigation establishes credibility.

Discovery of Enterprise Nature and Statute of Limitations Tolling

93. Prior to the federal investigation that commenced in December 2023, Plaintiff could not have known and did not know that his individual encounters were part of a systematic RICO enterprise involving dozens of victims, corporate facilitation through Bad Boy Entertainment and Combs Enterprises, and a decade-long pattern of racketeering activity.

94. During the federal investigation and subsequent criminal trial of United States v. Sean Combs, No. 24-cr-00542 (S.D.N.Y.), Plaintiff learned for the first time through Defendant Ventura's sworn testimony and other trial evidence the following facts that were essential to understanding the RICO enterprise but were previously concealed from him:

95. That Defendant Ventura personally trafficked multiple male victims using the identical fraudulent recruitment scheme employed against Plaintiff, including Jules Theodore, Daniel Phillip, Jonathan Odie, Sharay "The Punisher" Hayes, and numerous other men, establishing that Plaintiff's experiences were part of a systematic enterprise pattern rather than isolated incidents.

96. That Defendants utilized a coordinated travel agent or Bad Boy Entertainment staff (including Kristina Khoram) to systematically book interstate travel and hotel accommodations for trafficking purposes, demonstrating corporate facilitation of the racketeering activity.

97. That the enterprise operated with a common purpose across multiple victims, using substantially similar methods of identity concealment, substance manipulation, financial coercion, and interstate transportation, revealing the systematic nature of the RICO conspiracy.

98. That Defendant Ventura and an individual referred to as 'Jane Doe' worked interchangeably within the enterprise structure, collectively recruiting and trafficking over 50 male victims, demonstrating the enterprise's scope and continuity far beyond what Plaintiff could have discovered through his own individual experiences.

99. The December 2012 paradigmatic incident could not be understood as part of a RICO pattern until the federal investigation revealed that substantially identical sequences occurred with dozens of other victims using substantially similar corporate resources and control mechanisms. Specifically:

100. That the bail orchestration in December 2012—wherein Defendant Combs deployed Bad Boy Entertainment resources to post Plaintiff's bail through an employee meeting at the London Hotel—was not an isolated act of assistance but rather a systematic enterprise tactic used to create indebtedness, maintain control, and ensure continued victim availability.

101. That the immediate post-bail transportation from New York to Miami in December 2012 was a predicate act of interstate sex trafficking (subsequently charged as COUNT III in the criminal case), which Plaintiff is specifically named as a victim of in the Government's sentencing memorandum.

102. That the economic coercion resulting from Plaintiff's job loss—caused by the parole violation that resulted from Defendants coerced overnight detention in December 2012—was deliberately exploited by the enterprise to ensure Plaintiff's continued participation for years thereafter.

103. These revelations obtained through the federal investigation, trial testimony, and Government's victim designation fundamentally transformed Plaintiff's understanding of his victimization from individual acts of exploitation to systematic participation in a RICO enterprise.

104. Plaintiff's testimony and evidence provided to federal investigators was subsequently corroborated through hotel records, airline records, testimony from other victims including Defendant Ventura herself, and corporate records from Bad Boy Entertainment, establishing both Plaintiff's credibility and the systematic nature of the enterprise's operations.

105. The concealment of the enterprise's scope was particularly effective because: (a) Defendants isolated victims from each other, preventing knowledge of other victims; (b) corporate defendants' involvement was concealed through intermediaries and false cover stories; (c) the December 2012 bail payment appeared as personal assistance rather than enterprise control tactic; (d) the economic coercion created by job loss appeared as unfortunate consequence rather than deliberate enterprise strategy; and (e) the systematic nature of operations across dozens of victims remained hidden until revealed through federal investigation and trial testimony.

106. For these reasons, the discovery rule tolls all applicable statutes of limitations until Plaintiff learned through the federal investigation and trial testimony the essential facts establishing the RICO enterprise's existence, scope, and systematic nature.

107. At all times during the encounters from 2009-2019, Plaintiff believed he was engaging in consensual arrangements with two private individuals operating within the bounds of legal adult activity, albeit morally questionable. Plaintiff did not know and could not have known the full scope, nature, and illegality of Defendants' systematic criminal enterprise.

108. Plaintiff's awareness of the TRUE nature of his victimization—that he was a victim of a decade-long sex trafficking ENTERPRISE rather than a willing participant in private sexual encounters—did not and could not occur until the U.S. Attorney's investigation beginning in December 2023.

109. Prior to the federal investigation, Plaintiff lacked critical information that was exclusively within Defendants' knowledge and was actively concealed from Plaintiff, including: (1) That Defendants were operating a systematic trafficking enterprise involving dozens of male victims beyond Plaintiff; (2) That Defendant Ventura trafficked other men using identical fraudulent schemes; (3) That encounters were part of a RICO enterprise with systematic recruitment across multiple states; (4) That corporate defendants provided financial resources and logistical support; (5) That Plaintiff was one victim in a decade-long pattern of racketeering activity.

110. The systematic concealment of the enterprise's scope and nature constituted fraudulent concealment that tolled all applicable statutes of limitations pursuant to federal and state tolling doctrines.

FIRST CAUSE OF ACTION

FEDERAL SEX TRAFFICKING

18 U.S.C. §§ 1591, 1595

(*Against All Defendants*)

111. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Plaintiff brings this civil action under 18 U.S.C. § 1595, which provides a private right of action for victims of trafficking offenses enumerated in Chapter 77 of Title 18. At all times relevant hereto, Plaintiff was an adult over the age of eighteen (18) years.

Element One: Prohibited Acts

113. Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly recruiting, enticing, harboring, transporting, providing, obtaining, and maintaining Plaintiff for purposes of commercial sexual exploitation.

114. Specifically, Defendants: (1) Recruited Plaintiff through false representations and concealment of identity; (2) Transported Plaintiff across state lines from NYC to Miami and Los Angeles from 2012 to 2019; (3) Harbored Plaintiff in hotel suites while restricting his movement through confiscation of clothing, phones, and identification; (4) Maintained Plaintiff in a condition of sexual servitude through coercion, drug use, and manipulation.

Element Two: Commercial Sex Act

115. Defendants caused Plaintiff to engage in "commercial sex acts" as defined by 18 U.S.C. § 1591(e)(3), meaning "any sex act, on account of which anything of value is given to or received by any person."

116. The commercial sex acts included unprotected sexual intercourse, prolonged masturbation sessions, oral sex, and other sexual activities in exchange for money, accommodations, travel, and other things of value. Defendants received value through sexual gratification and the operation of their trafficking enterprise.

Element Three: Knowledge or Reckless Disregard

117. Defendants acted with knowledge or in reckless disregard of the fact that Plaintiff would be caused to engage in commercial sex acts. Defendants' knowledge is demonstrated by the numerous men now revealed to have been misled by the Defendants, as was testified by Defendant Ventura during USA v Sean Combs.

Element Four: Force, Fraud, or Coercion

118. Defendants employed fraud and coercion, as defined by 18 U.S.C. § 1591(e)(2), to compel Plaintiff's participation in commercial sex acts.

119. Fraud: Defendants concealed their identities using aliases ("Jackie Star," "Frank") for nearly two years. Defendants falsely represented themselves as a "married couple" when they were public figures operating a criminal enterprise. Defendants misrepresented drug dosages, with Ms. Ventura tripling MDMA doses to facilitate exploitation.

120. Coercion: Defendants systematically confiscated Plaintiff's phone, clothing, and identification to prevent safe departure. Defendants used financial control and manipulation as coercion. Defendants isolated Plaintiff in hotel suites requiring key access. Mr. Combs threatened violence including "pistol whip" threat and directing Ms. Ventura to retrieve his firearm.

121. Chemical Coercion: Defendants manipulated Plaintiff through involuntary drugging with MDMA at triple dosage, use of unknown substances causing severe physical reactions, and strategic drugging to lower inhibitions and facilitate sexual exploitation.

Interstate Transportation for Commercial Sex

122. Defendants engaged in interstate transportation for commercial sex in violation of 18 U.S.C. § 2421 et seq. (Mann Act) by systematically transporting Plaintiff from New York to Miami and Los Angeles for purposes of prostitution and commercial sexual exploitation.

123. The December 2012 sequence exemplifies this pattern: Defendants' coerced overnight detention caused curfew violation, leading to arrest and parole violation, followed by Defendant Combs orchestrating bail through Bad Boy Entertainment employee, followed immediately by interstate transportation to Miami for commercial sex, demonstrating systematic use of corporate resources for trafficking purposes.

124. Corporate defendants facilitated transportation through: (1) booking accommodations at hotels including Mandarin Hotel (Miami), SLS (Miami), The One Residences (Miami), Beverly Hills Hotel (Los Angeles); (2) registration under false names ("Frank Black"); (3) presenting Plaintiff to hotel staff as "Security for Bad Boy Records" to conceal trafficking; (4) use of Bad Boy staff including Kristina Khoram to provide access and coordinate logistics.

Pattern of Racketeering Activity

125. The trafficking was part of a RICO enterprise with: (1) Common purpose of soliciting men for commercial sex (Defendant Ventura testified to trafficking Plaintiff, Jules Theodore, Daniel Phillip, Jonathan Odie, Sharay Hayes, and others); (2) Interstate nature affecting commerce (Defendant Ventura testified to trafficking Plaintiff herself, and/or through use of a travel agent); (3) Multiple predicate acts over a decade-long period (Plaintiff trafficked from NYC to multiple locations); (4) Recruitment of dozens of male entertainers (Collectively, Defendant Combs and Ventura, along with "Jane Doe" recruited over 50 men).

Causation and Damages

126. As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1591 and 2421, Mr. Howard suffered severe physical injuries including genital trauma from prolonged forced masturbation causing skin tears and scabs, contraction of Chlamydia through forced unprotected sex, and drug-related physical trauma from involuntary drugging causing violent spasms and vomiting.

127. Plaintiff suffered severe psychological harm including PTSD, chronic anxiety, depression, and trauma from witnessing domestic violence. Plaintiff suffered economic harm including lost wages, diminished earning capacity, and medical expenses. Plaintiff suffered reputational harm through connection to criminal prosecution.

128. The trafficking, sexual exploitation, and resulting injuries to Mr. Howard occurred without fault or wrongdoing by the Plaintiff contributing thereto. Defendants herein acted without Plaintiff's meaningful consent and through prohibited means of force, fraud, and coercion as defined by 18 U.S.C. § 1591(e)(2).

129. Plaintiff's awareness of the TRUE nature of his victimization—that he was a victim of a decade-long sex trafficking ENTERPRISE rather than a willing participant in private sexual encounters—did not and could not occur until the U.S. Attorney's investigation beginning in December 2023.

130. WHEREFORE, Plaintiff seeks damages to be determined at trial, treble damages where applicable under federal RICO statutes, punitive damages, costs, disbursements, reasonable attorney's fees as provided by 18 U.S.C. § 1595(a), pre- and post-judgment interest, and such other relief as this Court deems just and proper.

SECOND CAUSE OF ACTION

CALIFORNIA HUMAN TRAFFICKING

Cal. Civ. Code § 52.5

(*Against All Defendants*)

131. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

Legal Elements

132. California Civil Code § 52.5 provides a private right of action for victims of human trafficking. To establish this claim, Plaintiff must demonstrate: (1) The Defendant(s) deprived or violated the personal liberty of another with intent to obtain forced labor or services; (2) Accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury; (3) The conduct falls within the definition of trafficking under Penal Code § 236.1.

Trafficking Conduct

133. Defendants deprived Plaintiff of personal liberty through systematic trafficking to California locations, including Beverly Hills Hotel in Los Angeles, where they harbored and controlled Plaintiff for commercial sexual exploitation.

134. Initial fraudulent contact: Ms. Ventura contacted Mr. Howard under false identity "Jackie Star," concealing her true identity and that Mr. Combs would be present, demonstrating intent to obtain forced sexual services through deception.

135. Interstate transportation: Beginning in 2012, Ms. Ventura and Mr. Combs systematically transported Mr. Howard from New York to Los Angeles using promises of gifts, money, and vacations as tools to manipulate him into compliance for commercial sexual exploitation.

Force, Fraud, and Coercion

136. Physical restraint: Defendants systematically confiscated Mr. Howard's clothing, cellphone, and personal belongings upon arrival, preventing safe departure and maintaining control.

137. Chemical coercion: Ms. Ventura strategically drugged Mr. Howard with MDMA at triple dosage to get him "freaky" and increase "encounter intensity," using substances "like a spider catching its prey in its web" to lower inhibitions and facilitate sexual exploitation.

138. Economic control: Once under Defendants' control, Mr. Howard had no means to return home without satisfying Ms. Ventura's demands, creating economic dependency where "money was used as a form of dominance."

139. Threats of violence: Mr. Combs threatened to "pistol whip" Mr. Howard and directed Ms. Ventura to retrieve his firearm from the master suite, demonstrating use of force and intimidation.

Sexual Assault in California

140. At Beverly Hills Hotel in October 2014, Ms. Ventura forced herself on Mr. Howard during her menstrual cycle against his will as punishment for refusing to fly to Los Angeles. Through manipulation, physical positioning, and Mr. Combs' presence, Ms. Ventura forced a sexual encounter.

141. She manipulated him through foreplay into a compromised position on the sofa. Mr. Howard repeatedly asked her to wait, but Ms. Ventura ignored him, pinning him to the couch. Ms. Ventura took hold of Mr. Howard's penis and inserted it into herself against his will.

142. When Mr. Howard discovered Ms. Ventura was menstruating heavily and became angry, Ms. Ventura laughed and said it wasn't a big deal, demonstrating calculated disregard for Plaintiff's bodily autonomy.

Systematic Pattern

143. Defendants structured encounters into four mandatory phases lasting hours, with one encounter sometimes having 10-15 individual sessions depending on detention length, during which Mr. Howard suffered physical injuries including tears to his penis shaft from prolonged forced masturbation.

144. Non-consensual recording: Defendants filmed Mr. Howard in compromising encounters without his consent for years, creating recordings that the couple would watch together and use for mutual masturbation, demonstrating ongoing violation of dignity and privacy rights.

145. Reckless health disregard: Defendants' conduct caused Mr. Howard to contract Chlamydia through forced unprotected sexual contact, with Ms. Ventura later revealing she had contracted the STD and blamed Mr. Combs' infidelity.

Causation and Harm

146. For damages sustained as a result of these California trafficking violations, Plaintiff incorporates by reference the Consolidated Damages section below (paragraphs 247-266).

147. WHEREFORE, Plaintiff seeks damages to be determined at trial, plus punitive damages, reasonable attorney's fees as provided by California Civil Code § 52.5, costs, disbursements, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

THIRD CAUSE OF ACTION

SEXUAL ASSAULT

Cal. Civ. Proc. § 340.16

(*Against All Defendants*)

148. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

1.  Legal Elements

149. California Civil Procedure Code § 340.16 provides an extended statute of limitations for civil actions arising from sexual abuse that occurred when the plaintiff was an adult. Sexual assault under California Penal Code § 243.4 requires: (1) touching an intimate part of another person, (2) while that person is unlawfully restrained, (3) against the will of the person touched, and (4) for the purpose of sexual arousal, sexual gratification, or sexual abuse.

Beverly Hills Hotel Sexual Assault (October 2014)

150. At Beverly Hills Hotel in October 2014, Ms. Ventura committed sexual assault as defined by California Penal Code § 243.4 by forcing herself upon Mr. Howard during her menstrual cycle against his will.

151. Unlawful restraint: Ms. Ventura accomplished the sexual assault while Mr. Howard was unlawfully restrained through "manipulation, physical positioning, and Mr. Combs' presence," seducing him into compliance, removing his clothing, and manipulating him through foreplay into a compromised position on the sofa.

152. Against victim's will: The sexual contact occurred against Mr. Howard's will as demonstrated by his repeated requests for Ms. Ventura to "wait," his anger upon discovering she was menstruating heavily, and his questioning "why she would do that to him."

153. Sexual gratification purpose: Ms. Ventura committed sexual battery by taking hold of Mr. Howard's penis and inserting it into herself for the purpose of sexual arousal and gratification, "finishing quickly" despite knowing she was menstruating heavily.

154. Calculated punishment: This assault was "calculated disregard as a punishment for refusing to fly to Los Angeles," demonstrating Ms. Ventura's willingness to use sexual violence as a means of control.

Pattern of Sexual Abuse

155. The Beverly Hills Hotel assault was part of a broader pattern of sexual abuse spanning nearly a decade, during which defendants systematically exploited Mr. Howard through "manipulation, coercion, controlled substances, and threats of violence to engage in non-consensual sexual activities."

156. Non-consensual recording: Defendants engaged in additional sexual abuse by filming Mr. Howard "in compromising encounters without his consent for years, creating recordings that the couple would watch together after the encounters ended and use for mutual masturbation," constituting ongoing sexual exploitation and privacy violations.

157. Chemical facilitation: The sexual abuse was facilitated through systematic drugging, with defendants administering "MDMA in doses three times stronger than what Defendant Ventura herself consumed, to lower his inhibitions and facilitate sexual exploitation," demonstrating premeditated sexual abuse through chemical incapacitation.

Ms. Ventura's Trial Testimony

158. During the trial of Defendant Combs, Ms. Ventura testified about an encounter where she claims Mr. Combs forced her into a sexual encounter with a male provider. Mr. Howard's truth differs greatly from that of Ms. Ventura.

159. Mr. Howard states the facts of the Beverly Hills Hotel incident detailed herein as the encounter referenced by Ms. Ventura during her testimony before the Federal Court. Mr. Howard denies Ms. Ventura's narrative, directly claiming it to be perjury before the Court.

Cover-Up by Corporate Defendants

160. Mr. Combs witnessed the sexual assault encounter and immediately attempted to "cover up" the matter by offering Mr. Howard additional monetary compensation for Ms. Ventura's actions, admitting that "Ms. Ventura was aware of her monthly cycle, but was

intoxicated and 'horney'" and had hoped Mr. Howard would not mind once the assault began.

161. Defendant Corporations engaged in a "cover up" as defined by Cal. Civil Procedure Code § 340.16(4)(A) by financing the accommodations where the sexual assault occurred and taking no efforts to protect Mr. Howard from harm by Ms. Ventura, while concealing evidence of the sexual abuse.

Timely Filing

162. This action is timely filed under California's discovery rule because Plaintiff did not discover and could not reasonably have discovered that he was a victim of systematic sex trafficking (as opposed to a willing participant in private encounters) until December 2023 when federal investigators contacted him and revealed the enterprise's scope.

163. For damages sustained as a result of these sexual assault violations, Plaintiff incorporates by reference the Consolidated Damages section below (paragraphs 247-266).

164. WHEREFORE, Plaintiff seeks compensatory damages, punitive damages given the egregious nature of the sexual assault and cover-up, attorney's fees and costs pursuant to California Civil Procedure Code § 340.16, medical and treatment expenses, pain and suffering damages, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

FOURTH CAUSE OF ACTION

NEW YORK HUMAN TRAFFICKING

N.Y. Servs. Law § 483-BB

(*Against All Defendants*)

165. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

Legal Elements

166. New York Services Law § 483-BB creates a private right of action for victims of human trafficking. To establish this claim, Plaintiff must demonstrate: (1) Victim status under human trafficking laws; (2) Trafficking conduct through recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through force, fraud, or coercion; (3) Purpose of subjecting victim to involuntary servitude, peonage, debt bondage, slavery, or commercial sexual exploitation; (4) Causation between trafficking conduct and injuries.

Victim of Human Trafficking

167. Mr. Howard was a victim of conduct constituting human trafficking as defined by New York Services Law § 483-BB, having been subjected to systematic recruitment, harboring, transportation, and exploitation for labor and services through force, fraud, and coercion over nearly a decade from 2009 to 2019.

168. Defendants engaged in human trafficking by systematically transporting Mr. Howard "from New York City to Miami and Los Angeles numerous times" beginning in 2012, using "promises of gifts, money, and vacations to coerce Mr. Howard into agreeing to leave NYC" for purposes of commercial sexual exploitation.

169. Defendants harbored Mr. Howard at New York locations including The London, The Trump International, The Gramercy Park Hotel, The Essex House Hotel, and The Intercontinental Hotel while "restricting freedom of movement" and isolating him in "hotel suites requiring key access with no stairwell access."

Force, Fraud, and Coercion

170. Physical restraint: Defendants used force by systematically confiscating "Mr. Howard's clothing, cellphone, and personal belongings upon arrival," preventing safe departure where "once under the defendants' control, Mr. Howard had no means to return home without satisfying Ms. Ventura."

171. Fraudulent recruitment: Defendants employed fraud through systematic deception, with Ms. Ventura using false identity "Jackie Star" and concealing that Mr. Combs would be present, while falsely representing themselves as a "married couple" when actually operating a trafficking scheme.

172. Chemical coercion: Defendants used coercion through involuntary drugging to compel services, with Ms. Ventura administering "MDMA in doses three times stronger than what Defendant Ventura herself consumed" and using substances "like a spider catching its prey in its web."

173. Economic control and threats: Defendants maintained control through "Financial compensation used as a form of dominance," detention beyond agreed timeframes, and Mr. Combs threatening to "pistol whip" Mr. Howard and "directing Defendant Ventura to retrieve his firearm."

Involuntary Servitude

174. Defendants subjected Mr. Howard to involuntary servitude by compelling him to provide both labor and sexual services against his will, with encounters structured into "four phases: (1) no touch, (2) soft foreplay, (3) fellatio, and (4) intercourse" where "Mr. Howard had no input and was expected to comply" for hours.

175. Defendants maintained economic dependency where he was "Asked to come for one day, he wasn't released until three days later," creating economic bondage through systematic exploitation.

Enterprise-Level Trafficking

176. Defendants operated a systematic trafficking enterprise involving "dozens of male entertainers being lured into the scheme," demonstrating the organized nature lasting "for over a decade" with coordinated recruitment of multiple victims.

177. New York male entertainers included Daniel Phillip and Sharay "The Punisher" Hayes, who both testified against Defendant Combs during the Federal Prosecution within the SDNY. Jules Theodore, a California-based male entertainer, was trafficked from California to New York, as revealed during the trial of Defendant Combs.

178. Corporate facilitation: The trafficking was facilitated through defendants' business enterprises, with "Bad Boy Records and Combs Enterprises" providing "financial resources, booking travel arrangements" while presenting victims as "Security for Bad Boy Records."

Commercial Sexual Exploitation

179. The trafficking was conducted for purposes of commercial sexual exploitation, with Mr. Howard being "Used for days as a sex slave, satisfying their physical and psychological needs" in exchange for financial compensation, travel arrangements, and accommodations.

180. For damages sustained as a result of these New York trafficking violations, Plaintiff incorporates by reference the Consolidated Damages section below (paragraphs 247-266).

181. WHEREFORE, Plaintiff seeks comprehensive economic damages pursuant to N.Y. Servs. Law § 483-BB, pain and suffering damages, punitive damages, reasonable attorney's fees and costs, medical and treatment expenses, restitution for exploited labor and services, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

FIFTH CAUSE OF ACTION

CIVIL RICO VIOLATION

18 U.S.C. § 1962(c)

(*Against All Defendants*)

182. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

Legal Elements

183. Civil RICO under 18 U.S.C. § 1962(c) prohibits conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity. To establish this claim, Plaintiff must demonstrate: (1) Enterprise existence; (2) Pattern of racketeering activity (at least two predicate acts within ten years that are related and demonstrate continuity); (3) Nexus between defendant, enterprise, and pattern; (4) Proximate causation of injury to business or property.

The RICO Enterprise

184. Defendants operated and participated in the conduct of an enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of "Mr. Combs, Ms. Ventura, Jane Doe, and the employees of the Defendant's business enterprises, who facilitated the encounters by providing supplies and booking accommodations."

185. The enterprise included formal legal entities including "Bad Boy Records and Combs Enterprises" which provided "financial resources, booking travel arrangements" and logistical support, while also encompassing informal associations that maintained continuity of structure and personnel over a decade from 2009 to 2019.

186. The enterprise had "a common purpose of soliciting men for the purposes of prostitution, to satisfy the depraved sexual desires of the Defendants," with coordinated operations involving systematic recruitment, transportation, and exploitation of victims across multiple states.

Pattern of Racketeering Activity

187. Defendants conducted the enterprise's affairs through multiple acts of racketeering activity, including violations of human trafficking laws (18 U.S.C. §§ 1581-1595), with systematic trafficking of Mr. Howard "from New York City to Miami and Los Angeles numerous times" beginning in 2012 and continuing through 2019.

188. The Defendants also trafficked other male escorts, all named within Count III and Count
V of *USA v Sean Combs, 24-cr-00542 (S.D.N.Y.)*, including Jules Theodore, Daniel
Phillip, Jonathan Odie, and Sharay "The Punisher" Hayes.

189. The enterprise engaged in violations of 18 U.S.C. §§ 2421-2424 (Mann Act) through
"transportation of male entertainers across state lines for the purpose of prostitution," with
defendants systematically moving victims across state lines for commercial sexual
exploitation. Mr. Combs was convicted of violations of 18 USC §§ 2421-2424, and at the
time of this filing, Mr. Combs awaits sentencing on those matters.

190. The racketeering acts were "related to each other and to the Enterprise because, for the
purpose of prostitution or a commercial sex act the Defendants would coerce individuals
to travel across state lines for the benefit of the Defendants," demonstrating both
relatedness and continuity over nearly a decade.

December 2012 as Paradigmatic RICO Pattern

191. The December 2012 incident demonstrates the related and continuous nature of the
racketeering pattern through its integration of multiple predicate acts within a single
coordinated sequence:

192. (1) Sex trafficking through coerced detention: Defendants' coerced overnight detention of
Plaintiff (sex trafficking violation of 18 U.S.C. § 1591) through confiscation of property,
sexual coercion, and substance manipulation was a racketeering predicate act within the
RICO enterprise.

193. (2) Interstate transportation immediately following bail: The immediate post-bail
transportation from New York to Miami in December 2012 was a Mann Act violation
(predicate act) that would not have occurred but for the bail orchestration and the
financial/emotional control established through the arrest sequence.

194. (3) Corporate facilitation through Bad Boy Entertainment bail payment: Defendant
Combs' orchestration of bail payment through Bad Boy Entertainment employee meeting
Plaintiff's mother at the London Hotel was an enterprise act demonstrating systematic use
of corporate resources to maintain control over trafficking victims.

195. (4) Systematic exploitation of resulting financial vulnerability: The employment
termination and resulting financial desperation was deliberately exploited by the
enterprise when Defendants reconnected with Plaintiff months later, using his economic

desperation—which they themselves had created—as the primary coercive mechanism to force continued participation.

196. This sequence being substantially similar to sequences involving dozens of other victims demonstrates both the 'relatedness' of acts (common participants, victims, methods, purposes) and 'continuity' (systematic repetition over decade-long period) required under *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989).*

Nexus: Operation and Management

197. Defendants conducted and participated in the conduct of the enterprise's affairs by managing and directing the systematic exploitation operation, with "Mr. Combs controlled progression and pace" and "Ms. Ventura controlled the start and sought Mr. Combs' permission to progress," demonstrating operational control.

198. The enterprise was conducted through defendants' legitimate business entities, with corporate defendants providing financial resources and logistical support for the racketeering activities, including booking accommodations and presenting victims as "Security for Bad Boy Records."

199. Defendants participated in the enterprise by systematically recruiting victims through fraudulent means, with Ms. Ventura using false identities and Mr. Combs directing encounters "as if he were a film director orchestrating his vision."

200. The December 2012 bail orchestration demonstrates 'operation or management' of the enterprise under *Reves v. Ernst & Young, 507 U.S. 170 (1993)*, as Defendant Combs directed Bad Boy Entertainment resources and personnel to effect Plaintiff's release, demonstrating his control over both the legitimate business entity and the trafficking enterprise.

Interstate Commerce and Multi-State Operations

201. The enterprise "engaged in and affected interstate and foreign commerce through transportation of male entertainers across state lines for the purpose of prostitution," with verified operations at hotels in New York, Miami, and Los Angeles.

202. The enterprise operated systematically over an extended period, with "the extent of this sex trafficking enterprise lasted for almost a decade, with dozens of male entertainers being lured into the scheme."

203. The racketeering activities affected interstate commerce through the use of corporate entities, interstate transportation networks, hotels, and financial systems to facilitate the systematic exploitation of victims across multiple jurisdictions.

Continuity and Relatedness

204. The pattern demonstrated closed-ended continuity through systematic criminal activities conducted over a substantial period from 2009 to 2019, with "Mr. Howard contacted for a period of almost a decade, flown to various states, and paid for commercial sex acts while the scheme continued to recruit new victims."

205. The racketeering acts were related through common participants (defendants), common victims (male entertainers), common methods (fraudulent recruitment and interstate transportation), and common purposes (commercial sexual exploitation).

Business and Property Injury

206. As a direct and proximate result of Defendants' RICO violations, Mr. Howard suffered concrete injury to his business and property interests.

207. Quantifiable job loss from December 2012 enterprise activity: The December 2012 coerced detention directly caused quantifiable economic injury through termination of Plaintiff's employment with Optyc Inc., resulting in immediate loss of wages, benefits, and legitimate earning capacity.

208. This job loss was proximately caused by the parole violation that resulted from the curfew violation that resulted from Defendants' predicate trafficking act of overnight detention, establishing concrete monetary damages flowing directly from RICO violations.

209. Economic coercion as continuing enterprise damage: The job loss caused by the December 2012 enterprise activity created financial vulnerability that the enterprise exploited for years, with Plaintiff's desperate economic circumstances—directly caused by enterprise conduct—serving as the primary coercive mechanism forcing continued participation.

210. All subsequent economic losses from 2012 forward flow from the December 2012 predicate acts through an unbroken causal chain of enterprise control and exploitation, satisfying RICO's proximate causation requirement for business/property damages.

Proximate Causation

211. The causal chain satisfies RICO's proximate causation requirement under *Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992)* because: (a) the injury flowed directly from the predicate acts without intervening causes; (b) the harm was foreseeable consequence of trafficking conduct; (c) there was direct relationship between racketeering activity and business/property injury; and (d) the enterprise specifically exploited the economic injury it created to perpetuate the racketeering pattern.

212. *Under Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006)*, RICO requires direct injury rather than attenuated competitive harm; the December 2012 sequence provides exactly such direct causation: predicate trafficking act → curfew violation → arrest → parole violation → job loss → income loss → financial vulnerability → forced continued participation → ongoing economic damages.

213. For additional damages sustained as a result of these RICO violations, Plaintiff incorporates by reference the Consolidated Damages section below (paragraphs 247-266).

214. WHEREFORE, Plaintiff seeks treble damages pursuant to 18 U.S.C. § 1964(c) in the amount of $30,000,000 ($10,000,000 base damages trebled) for injury to business and property, reasonable attorney's fees and costs, compensatory damages for all economic losses, restitution for exploited services, pre- and post-judgment interest, injunctive relief against continuing enterprise, and such other relief as this Court deems just and proper.

## CONSOLIDATED DAMAGES AND HARM

*(Applicable to All Causes of Action)*

Physical Injuries

215. As a direct and proximate result of Defendants' violations alleged in all causes of action, Mr. Howard suffered severe physical injuries including:

216. Genital trauma from prolonged forced masturbation and sexual activity that caused "skin tears and scabs on Mr. Howard's penis, causing severe pain and scarring," and tears to his penis shaft resulting in "skin peeling and scabbing" from extended sessions lasting hours without consideration for his well-being.

217. Sexually transmitted disease: Plaintiff contracted Chlamydia as a direct result of Defendants' reckless conduct in compelling unprotected sexual contact, requiring medical treatment and causing ongoing health concerns.

218. Drug-related physical trauma: Plaintiff suffered severe physical reactions from involuntary drugging, including uncontrollable sweating, violent spasms, intense stomach pain, and uncontrollable vomiting that forced him to crawl to a bathroom and left him "dizzy and weak on the bathroom floor" after being given unknown substances.

Psychological and Emotional Harm

219. Plaintiff suffered and continues to experience severe psychological trauma, post-traumatic stress disorder, chronic anxiety, and depression as a direct result of systematic sexual exploitation, manipulation, and witnessing repeated domestic violence between Defendants over nearly a decade.

220. Plaintiff experienced severe emotional distress from being sexually assaulted by Ms. Ventura during her menstrual cycle at Beverly Hills Hotel, where she forced herself upon him against his will as punishment, causing lasting psychological harm and trauma.

221. Plaintiff suffered ongoing violation of his dignity through non-consensual recording of sexual encounters that Defendants watched together and used for mutual masturbation, with Ms. Ventura demonstrating her control by masturbating to climax while watching previous recordings in front of Plaintiff.

222. Plaintiff developed post-traumatic stress disorder (PTSD) characterized by intrusive memories, nightmares, anxiety attacks, and avoidance behaviors that continue to affect his daily functioning and ability to engage in intimate relationships.

223. The sexual assault and systematic abuse caused Plaintiff to develop persistent fear and hypervigilance, particularly in situations involving potential intimate contact, creating ongoing psychological distress and limiting his ability to engage freely in social and professional settings.

Economic Losses

224. Plaintiff suffered financial harm through lost wages and diminished earning capacity because of the physical and psychological injuries sustained during the trafficking period, along with medical and mental health treatment expenses required to address the trauma.

225. The December 2012 enterprise activity directly caused termination of employment with Optyc Inc., resulting in immediate and continuing loss of wages, benefits, and legitimate earning capacity, with this job loss proximately caused by the parole violation resulting from Defendants coerced overnight detention.

226. Plaintiff has incurred and continues to incur substantial expenses for psychological therapy, psychiatric treatment, and mental health services required to address the trauma, including costs for PTSD treatment, anxiety management, and depression therapy.

227. Plaintiff has incurred medical expenses for STD treatment, medical evaluations, prescription medications for anxiety and depression, and ongoing healthcare costs related to trauma recovery.

228. The psychological impact of the abuse has diminished Plaintiff's ability to work and earn income, both through periods of inability to work due to trauma symptoms and ongoing reduced capacity due to anxiety, depression, and PTSD affecting professional performance.

Reputational and Professional Damage

229. Plaintiff's reputation and professional standing have been damaged as a result of his name being connected to the criminal prosecution of Sean Combs and the public exposure of his involvement in the trafficking scheme, with damages continuing to accrue as a result of the ongoing criminal proceedings.

230. The systematic exploitation and subsequent exposure through the criminal prosecution has caused damage to Plaintiff's reputation and standing in his community, with his name being connected to the criminal activities and causing harm to his personal and professional relationships.

231. The trauma from the abuse has negatively affected Plaintiff's career prospects and educational opportunities, limiting his ability to pursue professional advancement and achieve his full earning potential due to the ongoing psychological effects.

Loss of Personal Liberty and Dignity

232. Defendants' violations fundamentally violated Plaintiff's right to personal liberty by systematically confiscating his clothing, cellphone, and personal belongings, isolating him in hotel suites where he had "no means to return home without satisfying Ms. Ventura," effectively reducing him to conditions of involuntary servitude.

233. Plaintiff suffered severe dignitary harm through being subjected to conditions of involuntary servitude where he was treated as property rather than a person, with his human dignity violated through systematic exploitation for defendants' benefit over an extended period.

234. The assault fundamentally violated Plaintiff's sexual autonomy and caused lasting damage to his ability to trust intimate partners, with the defendants' systematic pattern of sexual exploitation creating ongoing psychological barriers to healthy sexual relationships and personal intimacy.

235. Plaintiff suffered severe humiliation and dignitary harm from the sexual assault, compounded by Ms. Ventura's dismissive reaction when she "laughed and said it wasn't a big deal" and her attempt to minimize the assault by blaming "intoxication and hormones."

Loss of Life Enjoyment and Relationships

236. Plaintiff suffered damage to personal relationships and social connections because of the trauma, secrecy, and psychological effects of the prolonged exploitation and abuse he endured at the hands of Defendants.

237. The systematic trafficking caused Plaintiff to suffer lasting psychological damage affecting his ability to trust others and form healthy intimate relationships, with the commercial exploitation creating ongoing barriers to personal fulfillment and normal social functioning.

238. Plaintiff's capacity to enjoy normal life activities has been diminished because of the trauma, including impaired ability to engage in social activities and pursue personal fulfillment without the burden of trafficking-related trauma.

239. Plaintiff suffered loss of capacity for enjoyment of life and other nonfinancial losses as a direct result of the systematic human trafficking and commercial sexual exploitation.

Constitutional Violations

240. Defendants' violations caused Plaintiff to be deprived of his fundamental constitutional rights to liberty, due process, and protection from involuntary servitude under the Thirteenth Amendment, causing both immediate harm during the trafficking period and continuing constitutional injury.

241. The human trafficking and systematic exploitation deprived Plaintiff of his fundamental rights to personal liberty and bodily autonomy under the United States Constitution and federal civil rights laws.

Ongoing and Continuing Harm

242. Plaintiff continues to suffer from ongoing fear of retaliation, anxiety about public exposure, and psychological distress that affects his daily life and ability to engage normally in social and professional settings.

243. The plaintiff's damages are ongoing and continue to accrue because of the lasting effects of the systematic exploitation and "Defendant Sean Combs criminal trial. After being exposed through the allegations of Ms. Ventura and an investigation by the US Attorney, Mr. Howard name has been connected to the criminality of the Defendants."

244. Plaintiff will continue to require ongoing mental health treatment, therapy, and medical care for the foreseeable future because of the lasting psychological impact of the systematic abuse, creating continuing economic damages.

Medical and Treatment Expenses

245. Plaintiff seeks recovery of all past and future medical expenses, psychological treatment costs, therapy expenses, prescription medications, and other healthcare costs necessitated by systematic abuse and its ongoing psychological effects.

246. Plaintiff has incurred and continues to incur substantial medical expenses for treatment of physical injuries including STD treatment, along with ongoing psychological therapy and mental health treatment required because of the trafficking violations and systematic commercial sexual exploitation.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Clayton Howard respectfully requests that this Court grant the following relief against Defendants:

Compensatory Damages

1. Award Plaintiff compensatory damages in an amount to be determined at trial for economic losses, physical injuries, psychological trauma, and other injuries sustained, including but not limited to:

   a. Past and future medical expenses for treatment of physical injuries, STD treatment, and ongoing psychological therapy;

   b. Past and future lost wages and diminished earning capacity;

   c. Pain and suffering from prolonged physical and sexual abuse;

   d. Emotional distress, PTSD, anxiety, and depression;

   e. Reputational harm and damage to professional relationships;

      f.   Loss of enjoyment of life and impaired ability to form healthy relationships.

      g.   Treble and Enhanced Damages

2.  Award Plaintiff treble damages pursuant to 18 U.S.C. § 1964(c) for RICO violations in the amount of $30,000,000 ($10,000,000 base damages trebled) for injury to business and property caused by Defendants' criminal enterprise.

Punitive Damages

3.  Award Plaintiff punitive damages in an amount sufficient to punish Defendants' egregious conduct and deter similar systematic trafficking and exploitation, including:

      a.   Punitive damages of $5,000,000 for federal sex trafficking violations;

      b.   Punitive damages under California Civil Code § 52.5 for human trafficking violations;

      c.   Punitive damages under California Civil Procedure Code § 340.16 for sexual abuse and cover-up.

Restitution

4.  Order Defendants to pay restitution for the value of labor and sexual services extracted through the trafficking enterprise, including compensation for all forced commercial sexual activities over the nearly decade-long exploitation period.

Declaratory Relief

5.  Issue a declaratory judgment that:

      a.   Defendants operated a criminal enterprise in violation of federal RICO statutes;

      b.   Defendants engaged in systematic human trafficking in violation of federal and state laws;

      c.   Defendants violated Plaintiff's constitutional rights to liberty, due process, and protection from involuntary servitude;

      d.   Plaintiff is a federally designated victim under 18 U.S.C. § 3771 entitled to Crime Victims' Rights Act protections.

Injunctive Relief

6.  Enjoin Defendants from:

      a.   Engaging in any further human trafficking or commercial sexual exploitation;

      b.   Operating or participating in criminal enterprises involving systematic exploitation of victims;

    c.  Using corporate resources to facilitate trafficking or related criminal activities;

    d.  Contacting, harassing, or retaliating against Plaintiff or other potential victims.

    e.  Attorney's Fees and Costs

7.  Award Plaintiff reasonable attorney's fees and costs pursuant to:

    a.  18 U.S.C. § 1595(a) for federal trafficking violations;

    b.  18 U.S.C. § 1964(c) for RICO violations;

    c.  N.Y. Servs. Law § 483-BB for human trafficking violations;

    d.  California Civil Code § 52.5 for human trafficking violations;

    e.  California Civil Procedure Code § 340.16 for sexual abuse violations.

Interest and Other Relief

8.  Award Plaintiff pre- and post-judgment interest on all monetary awards as provided by law.

9.  Grant such other and further relief as this Court deems just and proper under the circumstances, including any additional equitable remedies necessary to prevent future harm.

Jury Demand

10.  Plaintiff demands a trial by jury on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution.

Dated: December 02, 2025

Respectfully submitted,

*Clayton Howard*

Clayton Howard, Pro Se
245 Mill Road 4a
Staten Island, New York 10306
itsclaytonhoward@gmail.com
(929) 781-7791